# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MARIAN L. MOORE,

    Plaintiff,

    v.

    Civil Action No. 01-1576(CKK)

JOHN D. ASHCROFT, ATTORNEY
GENERAL, DEPARTMENT OF JUSTICE,

    Defendant.

## MEMORANDUM OPINION
(August 25, 2005)

Pending before the Court is Defendant's Motion for Summary Judgment.[1]  Plaintiff brings claims of race and gender discrimination and retaliation under Section 717 of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et. seq.* and Sections 501 and 504 of the Rehabilitation Act of 1973, 29 U.S.C. §§ 791 and 794a.  Plaintiff alleges that she was subjected to discrimination and retaliation when she was: "verbally assaulted" in the workplace, Compl. ¶ 7.a; wrongfully referred to the Federal Bureau of Investigation's ("FBI") Office of Professional Responsibility ("OPR") for misconduct, *Id.* ¶¶ 7.b, 8-10; given what she perceives as undesirable or unreasonable assignments and "embarrassed" in the presence of her colleagues, *Id.* ¶ 7.d-e; denied an opportunity to work as the acting chief in her supervisor's temporary absence, Pl.'s Opp'n at 3, 14; failed to receive a performance appraisal on one (1) occasion and was "downgraded" on another, Compl. ¶ 7.d; denied reasonable accommodation, *Id.* ¶ 7.g; denied

---

[1] John D. Ashcroft is no longer Attorney General of the United States, and has been replaced by Alberto R. Gonzales.  Pursuant to Federal Rule of Civil Procedure 25(d), Mr. Gonzales shall be substituted as the named defendant in this action.

two (2) requests for temporary duty and assignments, Supplement to Compl. ("Supp. to Compl.")

¶¶ 2-4; and had her official duty station changed, *Id.* ¶¶ 5-7.  Plaintiff also claims that she was

subjected to a hostile work environment, *id.* ¶ 7 and that the allegations in her Complaint

constitute a modified version of the traditional "pattern or practice" claim because she was

subjected to disparate treatment vis-á-vis similarly situated white males in the FBI when

punished through the OPR process.  *Id.* ¶ 11; Pl.'s Opp'n at 43 n.22.

After carefully considering the Defendant's motion, Plaintiff's Opposition, Defendant's

Reply, Plaintiff's Surreply, the submitted exhibits, and the relevant case law, the Court shall

grant Defendant's Motion for Summary Judgment.[2]

## I: BACKGROUND

The Court begins its discussion of the facts by noting that this Court strictly adheres to

the text of Local Civil Rule 56.1 (identical to Local Civil Rule 7(h) (formerly Rule 7.1(h))).  The

---

[2] Eight (8) months after the completion of briefing relating to Defendant's Motion for Summary Judgment, and nearly one (1) year after the completion of all discovery in this case, Plaintiff filed a motion requesting leave to file a second supplement to her Complaint.  Plaintiff's motion seeks to add new claims regarding her alleged isolation from her work unit, lack of meaningful work, too much work, failure to accommodate Plaintiff's health problems due to bad "circulation" in the new building in which she works, unreasonable restrictions with regard to her leave, and constructive discharge.  *See generally* Pl.'s Mot. for Leave to File Second Supp. Pursuant to Federal Rule of Civil Procedure 15(a), the Court shall exercise its discretion and deny Plaintiff's motion.  Discovery in this action has long been closed, Defendant's motion has long been pending, and Plaintiff has already had one opportunity to amend her Complaint.  The attempted addition of these claims -- none of which were exhausted administratively, many of which had occurred by the time Plaintiff filed her Complaint and its supplement, and all of which would require additional discovery -- is simply "a tactic designed to evade summary judgment." *Equity Group., Ltd. v. PaineWebber, Inc.*, 839 F. Supp. 930, 932 (D.D.C. 1993), *aff'd*, 48 F.3d 1285 (D.C. Cir. 1985).  As such, Plaintiff's motion is denied.

Plaintiff has also filed a Motion to Reconvene Mediation, which is opposed by Defendant.  Given Defendant's opposition, which essentially makes Plaintiff's effort futile, and given the dismissal of Plaintiff's case pursuant to this Opinion, the Court shall deny as moot Plaintiff's motion to reconvene.

local rules for summary judgment "assist[] the district court to maintain docket control and to decide motions for summary judgment efficiently and effectively." *Jackson v. Finnegan, Henderson, Farabow, Garret & Dunner*, 101 F.3d 145, 150 (D.C. Cir. 1996). "Requiring strict compliance with the local rule is justified both by the nature of summary judgment and by the rule's purposes. . . . The procedure contemplated by the rule thus isolates the facts that the parties assert are material, distinguishes disputed from undisputed facts, and identifies the pertinent parts of the record." *Id.* (quoting *Gardels v. CIA*, 637 F.2d 770, 773 (D.C. Cir. 1980). "[A] district court should not be obliged to sift through hundreds of pages of depositions, affidavits, and interrogatories in order to make [its] own analysis and determination of what may, or may not, be a genuine issue of material fact." *Id.* (quoting *Twist v. Meese*, 854 F.2d 1421, 1425 (D.C. Cir. 1988)). As such, in resolving the present summary judgment motion, this Court "assumes that facts identified by the moving party in the statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." LCvR 56.1; 7(h). The Court also cites directly to the record, where appropriate, to provide additional information not covered in either of the parties' statements.[3]

---

[3] Plaintiff has attempted to comply with her obligation to provide "a separate concise statement of genuine issues setting forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated," LCvR 56.1; 7(h), in opposition to Defendants' Statement by submitting a Statement of Genuine Issues. *See* Pl.'s Stmt. of Genuine Issues ("Pl.'s Stmt.") at 1 ("Plaintiff . . . pursuant to Local Civil Rule 7.1(h) and Fed. R. Civ. R. 56 [sic], submits this statement of genuine issues in opposition to Defendant's Statement of Material Facts Not In Dispute."). The Court notes that the more useful practice is to actually refer to the specific paragraphs of Defendant's Statement that are in dispute so that the Court may easily identify the factual disputes. Defendant has presented a sixty one (61)-paragraph, thirteen (13)-page Statement of Facts, the vast majority of which are not implicated by the facts Plaintiff recites in her twenty three (23)-paragraph, five (5)-page Statement of Genuine Issues, a document that is not presented in any thematic or chronological order but rather appears to be a nothing more than a haphazard collection of Plaintiff's grievances. While Plaintiff has included a more

Plaintiff Marian L. Moore, an African-American female, began working for the FBI in
1967.  Def.'s Ex. 2 (12/17/02 Moore Dep.) at 9:24.  In 1975, Plaintiff became a Fingerprint
Specialist in the Latent Fingerprint Section of the FBI's Laboratory Division ("Laboratory
Division" or "LD"), where she worked for 19 years, until 1994.  *Id.* at 10:12-10:13, 12:2-12:5.
Plaintiff reached the GS-12 pay level in 1985.  *Id.* at 12:10.  In 1987, Plaintiff and her twin sister,
who was also a fingerprint specialist, began to complain of respiratory problems.[2]  Def.'s Ex. 1
(02/24/95 Ahlerich Mem.) at 2.  Beginning in March 1993, the FBI attempted to find other
positions within the LD where Plaintiff could be assigned.  *Id.* at 6.  As part of that effort, in July,
1994, the FBI recommended that Plaintiff be assigned to a GS-12 Management Analyst position
in the Administrative Unit of the Laboratory Division ("Administrative Unit" or "AU"), *id.* at 10,
and on March 17, 1995, the recommendation was implemented.  *Id.* at 12.  Plaintiff has never
requested that she be returned to her position in the Latent Fingerprint Unit, and has served as a
Management Analyst since April 1995.  Def.'s Ex. 2 (12/17/02 Moore Dep.) at 52:22-53:2.

In 1993 and 1994, Plaintiff filed formal complaints of discrimination with the FBI's
Office of Equal Employment Opportunity Affairs.  *Id.* at 24:7-24:8.  The 1993 claim alleged

---

detailed factual background section in her briefing, such a factual proffer does not comply with
the Local Rules, which Plaintiff herself cites at the top of her Statement of Genuine Issues, and
therefore have not been considered by this Court in determining which facts are in dispute.  *See*
LCvR 56.1; 7(h); *see also Interim Servs., Inc. v. Interim, Inc.*, 6 Fed. Appx. 12, 13 (D.C. Cir.
2001) (affirming summary judgment when defendant's opposition to motion was not
accompanied by a separate concise statement of genuine issues setting forth material facts, as
required under local rules and that the facts identified by plaintiff were therefore admitted).

[2] Plaintiff's twin sister, Ms. Marilyn Ferguson is mentioned on numerous occasions by
each party.  While Plaintiff and her sister appear to do everything at the FBI together, the Court
notes that Ms. Ferguson is not a party to this suit and that mention of her relationship to Plaintiff
or history with Defendant does nothing to advance either party's legal arguments.  Ms. Ferguson
is simply irrelevant to the case at bar.

discrimination on the basis of sex, race and disability, and was brought against managers in the

Latent Fingerprint Section.  *Id.* at 24:9-24:24.  The 1994 claim was identical to the 1993 claim

except that it added a claim of retaliation.  *Id.* at 28:5 - 28:12.  Plaintiff filed a civil action in this

District Court in July 1996, alleging discrimination on the basis of sex, race and disability

(physical rhinitis) as well as retaliation for having filed the discrimination complaints.  Compl. ¶

6.  Plaintiff's case was settled on March 10, 1998, and Plaintiff stipulated to the settlement of all

claims she had on or before March 10, 1998.  Def.'s Ex. 3 (Stipulation of Settlement and

Dismissal, *Moore v. Reno*, Civil No. 96-1627 HHG (D.D.C.)).  As part of the settlement,

Plaintiff was promoted to GS-13.  *Id.* ¶ 3.

In January 1999, the Administrative Unit was divided into two (2) units: the Finance Unit

and the Human Resources Unit.  Def.'s Mot. for Summ. J. at 3; Pl.'s Opp'n at 6.  Plaintiff was

assigned to the Human Resources Unit where she continued to work as a Management Analyst.

Def.'s Ex. 2 (12/17/02 Moore Dep.) at 54:18-56:7.  Plaintiff's primary duties "consisted of

posting merit vacancy notices, evaluating applicants and doing staffing duties, which at times

also included conducting studies and doing research, but mostly posting vacancy notices."  *Id.* at

56:4-56:7.  Ms. Janet Cantamessa was designated Unit Chief ("Unit Chief" or "UC") of the

Human Resources Unit in January 1999, and joined the unit in April 1999.  Def.'s Ex. 4

(01/25/99 Mem. from Laboratory to Director's Office).  Ms. Cantamessa's assignment was a

lateral transfer from the FBI's Information Resources Division ("Information Resources

Division" or "IRD"), where she had been the Personnel Management Unit Chief.  Def.'s Ex. 4

(01/25/99 Mem. from Laboratory to Director's Office); Def.'s Ex. 5 (01/17/02 Cantamessa Dep.)

at 11:17-18:21; Def.'s Mot. for Summ. J. at 4.  Ms. Cantamessa held a similar position in the

FBI's Criminal Division from 1991-1996.  Def.'s Ex. 4 (01/25/99 Mem. from Laboratory to

Director's Office); Def.'s Ex. 5 (01/17/02 Cantamessa Dep.) at 19:7-19:10.  In April 1999, Ms.

Cantamessa became Plaintiff's supervisor, as well as her rating official for purposes of her

performance evaluations.  Def.'s Stmt. of Material Facts not in Dispute ("Def.'s Stmt.") ¶ 56.

     *A.     September 1999 Incident*

     On September 8, 1999, Plaintiff was asked by Ms. Cantamessa to draft an electronic

communication ("EC") regarding the grant of leave to the agency's administrative employees

who had been deployed to Kosovo.  *See* Pl.'s Opp'n at 7; Def.'s Ex. 27 (OPR Materials) at 5;

Pl.'s Ex. 11 (9/9/1999 Memo from Ms. Cantamessa to Plaintiff) at FBI-1008-09; Pl.'s Ex. 11

(9/13/99 Memo from Plaintiff to Mr. DeVincentis) at FBI-1010-12.  Ms. Cantamessa provided

Plaintiff a previously published EC, and asked Plaintiff to make minor administrative changes to

the document and the substantive change of making a two (2) day administrative leave a three (3)

day administrative leave.  *Id.*  After Mr. Cantamessa sought a status report regarding Plaintiff's

progress on the assignment the following day, Plaintiff informed her that she could not complete

the assignment because she was provided limited information and would not do the EC unless

told specifically what it should say.  *Id.*  A disagreement then erupted between Plaintiff and Ms.

Cantamessa after Ms. Cantamessa advised Plaintiff that, given her GS-13 level, she should be

able to complete the assignment without direct supervision, and noted that she considered

Plaintiff's performance to be at an unacceptable level.  *Id.*  According to Ms. Cantamessa, and

undisputed by Plaintiff, "At this point, Ms. Moore became agitated, came close to me, pointing

her finger and raised her voice while stating that she does not do anything without specific and

clear instruction and doesn't like her competence questioned."  Def.'s Ex. 27 (OPR Materials) at

5.  Ms. Cantamessa then asked Plaintiff to lower her voice and stop pointing her finger; Plaintiff

refused, and stated that she would not complete the Kosovo Deployment EC task.  *Id.*  Ms.

Cantamessa then reassigned the task, documented the incident, and informed her Section Chief.

*Id.*

On September 10, 1999, Ms. Cantamessa attempted to counsel Plaintiff regarding her

refusal to complete the assignment.  *Id.* at 6.  During this session, Ms. Cantamessa asked Ms.

Kimberly Hawkins, Plaintiff's former supervisor and a GS-14 Supervisory Management Analyst,

to witness the session.  *Id.*; *see also* Def.'s Ex. 17 (Hawkins Stmt.) at 1; Def.'s Ex. 22 (Thurman

Stmt.) at 1.  During the counseling session, Plaintiff became upset over the issue of her

competence and over the presence of Ms. Hawkins.  *Id.*  After she became upset, Plaintiff

abruptly left the room, pausing to state to Ms. Cantamessa, ". . . go ahead and keep pushing me

because I promise that if you keep pushing I will push and push you harder and you have a

witness who heard me say that."  *Id.*  Ms. Cantamessa interpreted Plaintiff's statements as a

"threat."  *See* Def.'s Ex. 27 (OPR Materials) at 6.  Ms. Hawkins recalled that on the whole, "I did

not think that Ms. Moore's language was disrespectful but her demeanor was confrontational

particularly as she departed."  Def.'s Ex. 17 (Hawkins Stmt.) at 2.  Ms. Hawkins agreed with Ms.

Cantamessa's recollection of Plaintiff's exiting statement, and "interpreted" her words "to be

threatening" as well.  *Id.*[3]  After two (2) days, Ms. Cantamessa met with Plaintiff again, and they

were able to foster an amicable understanding regarding the need to cooperate and work as a

---

[3]  Plaintiff devotes three (3) paragraphs of her Opposition to an explanation of this
incident; however, while Plaintiff disputes the difficulty of the assignment she was given by Ms.
Cantamessa, she does not dispute the September 10, 1999, events as detailed by Ms. Hawkins
and Ms. Cantamessa and cites to no contrary evidence in the record supporting any recollections
other than these.  Pl.'s Opp'n at 7-8.

team.  Def.'s Ex. 15 (Cantamessa Stmt.) at 3.

A subsequent Office of Civil Rights ("OCR") investigation of this incident concluded that Plaintiff had unprofessionally raised her voice and made what was perceived to be a threatening statement.  Def.'s Stmt. ¶ 21.

B.      *February 2000 Incident*

On February 25, 2000, Plaintiff was assigned the task of preparing a vacancy announcement for a secretarial position in the Laboratory Division.  Def.'s Stmt. ¶ 1.  On February 28, 2000, Plaintiff and Ms. Cantamessa discussed the vacancy posting at Plaintiff's cubicle and had a disagreement over how the posting should be "effectuated."  *Id.* ¶ 2. Specifically, Plaintiff and Ms. Cantamessa clashed over two details.  First, Ms. Cantamessa believed that the vacancy posting could be prepared and developed because another individual (Mr. Wempy) was leaving the Unit, meaning that the Unit would not be over the ceiling for number of employees once the posting was effectuated.  *See* Def.'s Ex. 5 (01/17/02 Cantamessa Dep.) at 97:2-101:9.  Plaintiff, on the other hand, felt that she should not begin work on the posting because the posting request had not been approved yet by the Unit Chief due to the fact that Mr. Wempy had not yet left the Unit and therefore still counted towards the final ceiling totals.  *See* Def.'s Ex. 9 (Moore Stmt.) at 2-3.  Second, Ms. Cantamessa felt that since Plaintiff had access to the information needed to fill out the form, Plaintiff could complete the form herself and then get the Unit Chief to sign it.  Pl.'s Ex. 6 (01/17/02 Cantamessa Dep.) at 101:4-101:9.  In contrast, Plaintiff asserted that it was the Unit Chief's responsibility to fill out the

form.  Def.'s Ex. 9 (Moore Stmt.) at 3.[4]

As this discussion began, Ms. Cantamessa was standing next to Plaintiff's desk, where

Plaintiff was seated, and was more than an arm's length away.  Def.'s Ex. 5 (01/17/02

Cantamessa Dep.) at 110:10-111:9.   During their discussion, Ms. Cantamessa once again

reminded Plaintiff of her job grade level (GS-13),  Pl.'s Ex. 6 (01/17/02 Cantamessa Dep.) at

102:9-102:17, in order to suggest that she expected an employee at that level to work

independently and be flexible so that she made the job of managers easier in doing personnel

work, not more complicated.  Pl.'s Ex. 6 (Cantamessa Dep.) at 102:18-103:1; Def.'s Ex. 9

(Moore Stmt.) at 3.[5]  Plaintiff took exception to Ms. Cantamessa's reference to her grade level,

and stated that she was tired of Ms. Cantamessa questioning her competence.  Def.'s Ex. 5

(01/17/02 Cantamessa Dep.) at 104:6-7; Def.'s Ex. 9 (Moore Stmt.) at 3.  It is uncontested that at

this point, Plaintiff stood up to confront Ms. Cantamessa.  According to Ms. Cantamessa,

> Ms. Moore rose quickly out of her chair and approached me in a threatening
> manner.  She frighten[ed] and intimidated me as she is much taller than me.  Ms.

---

[4] Ultimately, it appears as though Ms. Cantamessa's request did go against the LD's policy.  *See* Def.'s Ex. 27 (OPR Materials).  Plaintiff, in her Opposition, makes much of this fact, *see* Pl.'s Stmt. ¶ 5 (citations omitted), but ultimately, the dispute boiled down to a debate over whether it was procedurally appropriate to prepare a posting in advance, and then get the Unit Chief to sign it when a vacancy had been created, versus whether to wait to commence work until the vacancy had actually appeared.

[5] Plaintiff states that "Cantamessa verbally assaulted plaintiff in the workplace, standing over her in a confined space and raising her voice at plaintiff for plaintiff's justified reluctance to carry out Cantamessa's instructions, which were in violation of FBI policy."  Pl.'s Stmt. ¶ 5.  In support of this statement, Plaintiff's attorney cites to her own Answers to Defendant's First Set of Interrogatories, a document fifty-seven (57) pages in length, without providing a pinpoint citation, and without any other citation to documentary evidence or testimony.  Again, it is not the Court's duty to examine lengthy documents to find the parts that support a party's argument.  As such, the Court determines that this allegation is unsupported.

> Moore leaned towards my face and screamed that she would not fill out the form
> in question.  I asked her to return to her seat and comport herself appropriately.

Def.'s Ex. 15A (Cantamessa Stmt.) at 6; *see also* Def.'s Ex. 27 (OPR Materials) at 2 (noting that

Ms. Cantamessa's statement comported with her contemporaneous documentation of the incident

on 2/27/00) ("Ms. Moore, at this point, jumped out of her chair (I was standing next to her desk)

and moved extremely close to me saying in a loud voice, her I go again, questioning her skills.");

Def.'s Ex. 2 (12/17/02 Moore Dep.) at 105:17-20 ("I pushed my chair out and stood up, and at

that time she told me to get out of her face, and after that point -- and I think I may have made a

statement to her saying, no, you get out of my face.").  Two fellow employees heard this incident

from their neighboring cubicles, and entered later statements supporting Ms. Cantamessa's

version of events.  Ms. Freda Hyatt, a GS-11 Management Analyst, heard the incident from her

cubicle and found Plaintiff's voice to be "loud and unprofessional."  Def.'s Ex. 18 (Hyatt Stmt.)

at 1.  Ms. Cynthia Merrill, a GS-13 Management Analyst, noted that:

> . . . There was a question about a form to which the UC [Ms. Cantamessa]
> explained that Ms. Moore could fill out the form herself.  Ms. Moore did not think
> it was her responsibility.  Ms. Moore's voice was assertive and angry.  I heard the
> UC say that, "You're a GS-13 you should be able to do this work."  Ms. Moore
> replied that, "You're always throwing that in my face."
>
> I also heard the UC say, "Don't get in my face," and "I'll take care of it myself."
> The UC then walked away.  Though I recall that the UC had raised her voice, it
> was in response to Ms. Moore's confrontational voice and her conduct.

Def.'s Ex. 16 (Merrill Stmt.) at 2; *see also* Pl.'s Ex. 6 (01/17/02 Cantamessa Dep.) at 104:15-18

("I did not yell, but I may have said it very sternly.").  Ms. Heller, a GS-11 analyst, also

overheard the confrontation, and thought that "both UC Cantamessa and Ms. Moore exhibited

unprofessional behavior."  Def.'s Ex. 19 (Heller Stmt.) at 2.

10

Believing that Plaintiff approached her in an inappropriately aggressive manner, Ms. Cantamessa subsequently decided to report the incident to the FBI's Office of Professional Responsibility ("OPR").  Def.'s Stmt. ¶ 3.  The action was taken because Ms. Cantamessa felt it was important to take measures to maintain control of the Unit and to demonstrate that what she considered unprofessional and disruptive conduct would not be tolerated.  Def.'s Ex. 5 (01/17/02 Cantamessa Dep.) at 115:10-117:5.  On March 10, 2000, OPR notified the Laboratory Division that it had begun an inquiry into Ms. Cantamessa's allegation that Plaintiff had acted unprofessionally and disrupted the workplace by attempting to physically threaten her and failing to perform a work assignment as instructed by her supervisor.  Def.'s Stmt. ¶ 4.  The communication requested that the Laboratory Division provide Plaintiff with a copy of the notification and advise her of certain rights to which she was entitled.  *See* Def.'s Ex. 10 (3/10/05 OPR Notification) at 1.  This directive was effectuated on March 23, 2000, when Mr. Keith DeVincentis -- Ms. Cantamessa's supervisor and the Section Chief of the Investigative Support Section, Laboratory Division -- acted as the presenting official and provided Plaintiff the communication.  *Id.*; Def.'s Ex. 11 (DeVincentis Stmt.) at 9.

On March 20, 2000, OPR requested that the Laboratory Division investigate the allegations in Ms. Cantamessa's referral.  Def.'s Stmt. ¶ 5.  The Laboratory Division was directed to interview Plaintiff's supervisor, any other witnesses having knowledge of the allegations, and Plaintiff herself.  *Id.*  The relevant OPR investigative guidelines instructed that all interviews of FBI employees must be reported in the form of a typed, signed sworn statement.  *See* Def.'s Ex. 13 (Conducting OPR Investigations) at 1.  The Laboratory Division assigned Unit Chief Robert Laughlin to conduct the OPR investigation.  Def.'s Stmt. ¶ 6.  After Mr. Laughlin had begun his

11

investigation and collected a number of statements, the investigation was taken over by William

Warner, who interviewed Plaintiff on April 12, 2000.  *Id.* ¶ 8.

At the April 12, 2000 interview, Plaintiff provided Mr. Warner with an unsigned four (4)-

page typewritten document entitled "Statement of Marian L. Moore," and supporting

documentation.  Def.'s Stmt. ¶ 9; Def.'s Ex. 25 (Unsigned Moore Stmt.).  Mr. Warner felt that

the statement only vaguely addressed the allegations in question and considered the

accompanying documentation unrelated to resolution of the issues.  *Id.*  Mr. Warner asked

Plaintiff to give her account of the allegations that had been raised by the referral and that had

been addressed by other witnesses who provided statements.  *Id.* ¶ 10.  After the conclusion of

the interview, Mr. Warner gathered together his notations from his discussion with Plaintiff and

crafted a new statement that attempted to comport with her views by 2:15 p.m. on April 12,

2000.  *See* Def.'s Ex. 24 (4/28/00 Warner FD-302) at 1-6.  Due to time pressures caused by

Plaintiff's work schedule, Mr. Warner scheduled a meeting on April 18, 2000, in order to review

this prepared statement with Plaintiff, with Ms. Alicia L. Brew acting as a witness.  *Id.*

Following her review, Plaintiff "made numerous comments about [the statement] to include the

fact that she did not agree with the 'composition' of the statement.  She said it s merely another

person's version of what she said."  *Id.* at 6.  Despite the fact that Mr. Warner went over each

paragraph with her and offered to make all the changes to the document that Plaintiff had

requested, Plaintiff continued to refuse to sign the document because it had been drafted by

someone other than herself; Plaintiff emphasized that she preferred her own "composition."

Def.'s Stmt. ¶ 10; Def.'s Ex. 24 (4/28/00 Warner FD-302) at 1-6 (Plaintiff refused to sign both

before and after the lunch break on April 18, 2000).  When told that her original statement did

not directly address the allegations against her, Plaintiff simply disagreed and refused to accept any revised statement.  *Id.* at 7.

On May 2, 2000, Mr. Warner submitted a summary of his investigation to OPR.  Def.'s Stmt. ¶ 11. Warner recommended that Plaintiff receive a five (5)-day suspension and a probationary period not to exceed six (6) months.  *Id.*  On May 24, 2000, the matter was referred to the OPR Adjudication Unit "for review and appropriate action."  *Id.* ¶ 12.  The Adjudication Unit completed its review of the matter on October 31, 2000.  *Id.* ¶ 13.  It found that Plaintiff "acted unprofessionally during the February 28, 2000 incident by raising her voice and acting in a manner that Ms. Cantamessa found to be physically threatening."  *Id.* ¶ 14 (quoting Def.'s Ex. 27 (OPR Materials, Addendum: OPR Adjudication Unit II) at 16.

The Adjudication Unit noted that Plaintiff denied raising her voice, but found her contention was refuted by the recollections of two (2) other employees in addition to Ms. Cantamessa. *Id.* ¶ 15.  It also recognized that Ms. Canatmessa's instruction to Plaintiff to complete the Vacancy Posting Request Form arguably was not a "legitimate instruction by a superior to a subordinate" because it contradicted Laboratory Division policy governing vacancy postings.  *Id.* ¶ 20.  The Adjudication Unit found, however, that Plaintiff's "actions and extreme reaction to UC Cantamessa exercising her supervisory authority were highly unprofessional and indicative of a verbal altercation," and violated the standards of conduct mandated by FBI regulations.  *Id.* ¶ 18.  The Adjudication Unit further determined that Ms. Cantamessa's perception that she was being physically threatened on February 28, 2000 was reasonable in view of Plaintiff's confrontational history with Ms. Cantamessa and others in the Human Resources Unit, the fact that Plaintiff is "physically more imposing" than Ms. Cantamessa, and the fact that

the confrontation occurred within the confines of a cubicle.  *Id.* ¶ 16.

The Adjudication Unit did not find that Plaintiff was insubordinate during the February 28, 2000 confrontation with Ms. Cantamessa, *id.* ¶ 19, or that Plaintiff intended to intimidate or threaten Ms. Cantamessa.  *Id.* ¶ 17.  It summarized that:

> [I]t is quite clear that [Plaintiff] overreacted to the situation and acted in a manner UC Cantamessa found frightening.  She also adversely affected her co-workers by noisily disrupting the workplace and by forcing UC Cantamessa to select another employee to complete her work.
>
> [Plaintiff's] unreasonable reactions to work assignments were not limited to the unprofessional behavior and insubordination discussed above.  In September 1999, she loudly and angrily confronted UC Cantamessa about a Kosovo deployment EC.  At that time she pointed her finger at UC Cantamessa and again unprofessionally raised her voice to her.  Moreover, [Plaintiff] said, "go ahead and keep pushing because I promise that if you keep pushing I will push and push you harder."  In addition to UC Cantamessa, a witness also perceived this to be a threat.  This confrontational scene once again resulted in a co-worker completing the assignment because [Plaintiff] refused to do so.  [Plaintiff]'s failures to handle assignments believed to be well within her range of expertise and grade level resulted in counseling by UC Cantamessa.  Moreover, by disrupting the workplace and adversely affecting the Unit, [Plaintiff] violated all of the [FBI regulations] previously cited above with respect to her unprofessional conduct on February 27-28, 2000.

Def.'s Ex. 27 (OPR Materials, Addendum) at 18-19.

### C.   *Adjudication Unit's Disciplinary Action*

To determine the appropriate disciplinary measures for Plaintiff's misconduct on February 28, 2000, the Adjudication Unit reviewed relevant precedent cases.  Def.'s Stmt. ¶ 22. OPR categorizes employee misconduct into Offense Codes.  *Id.* ¶ 23.  OPR reviewed precedent cases with the following Offense Codes:  5A Verbal Altercations; 38 J, Unprofessional Conduct - Not Otherwise Specified; and 19C, Insubordination - Belligerent, Threatening, and Abusive Behavior.  *Id.*  In surveying the precedent cases, OPR found that

> [m]ost employees who engaged in verbal altercations in the workplace, acted
> unprofessionally in the workplace, or were insubordinate to their supervisor,
> received a letter of censure.  However, when the case was more aggravating
> because it was the employee's second offense or the employee had been
> previously counseled or had a history of insubordination, they received probation
> along with their censure or were suspended and placed on probation.

Def.'s Ex. 27 (OPR Materials, Addendum) at 19 (internal citations omitted); Def. Stmt. ¶ 24.

The OPR analogized Plaintiff's case to a precedent case in which an employee failed to attend to her duties on two (2) occasions, causing her co-workers to cover for her; engaged in loud and disrespectful conduct on another occasion; and undermined her supervisor's authority by making derogatory comments.  Def.'s Stmt. ¶ 25.  The employee in that case received a ten (10) day calender suspension without pay and six (6) months of probation.  *Id.*  The Adjudication Unit noted that Plaintiff's

> situation is similar in several respects. [Plaintiff] refused to complete her assigned
> duties for which her co-workers had to cover for her.  When she asserted that she had
> not been given sufficient information to complete tasks, she loudly, disrespectfully,
> and rudely comported herself and disrupted the Unit.  She wrongfully challenged her
> supervisor and acted confrontational towards her.  Her unprofessional conduct and
> challenging attitude toward Cantamessa disrupted and arguably demoralized the Unit
> overall.  Thus, it appears that [Plaintiff] engaged in misconduct similar to the
> employee [in the cited case].

Def.'s Ex. 27 (OPR Materials, Addendum) at 20.  Further informing the Adjudication Unit's decision was its finding that Plaintiff's credibility was undermined by (1) her failure to sign both her statement and the statement prepared by Mr. Warner and (2) her initial refusal to answer a direct question about her conduct during the Kosovo EC incident in September 1999.  Def.'s Stmt. ¶ 25; Def.'s Ex. Ex. 24 (4/28/00 Warner FD-302) at 2-3; Def.'s Ex. 27 (OPR Materials) at 20-21.

Based on those aggravating factors and the precedent cases, the Adjudication Unit recommended that Plaintiff be suspended for three (3) calender days without pay and placed on probation for one (1) year.  Def.'s Stmt. ¶ 26.  Plaintiff appealed the OPR's decision to the FBI's Inspection Division on July 3, 2001.  Def.'s Ex. 30 (Moore Letter to Inspection Division).  By letter dated October 23, 2001, the OPR's decision was affirmed.  Def.'s Ex. 31 (Letter from Thomas Bernard Locke to Plaintiff).  Plaintiff's suspension commenced at the close of business Friday June 9, 2001, and therefore covered only one (1) work day -- Monday, June 12, 2001.  Def.'s Ex. 29 (SF-50 Notice of Personnel Action).  Plaintiff's one (1) year probation began on Tuesday, June 13, 2001 upon return from her suspension.  Def.'s Ex. 27 (OPR Materials) at 8.

D.       *Plaintiff Seeks Assistance From FBI Ombudsman*

As a result of what she considered to be "hostile and adverse working conditions created by Ms. Cantamessa," Plaintiff sought the assistance of the FBI's Ombudsman office and Equal Employment Opportunity ("EEO") Counselor Mr. Jerome Simpson at some point during her disciplinary process.  Def.'s Stmt.¶ 27 (quoting Def.'s Ex. 2 (12/17/02 Moore Dep.) at 57:9-57:18).[6]  Ms. Allyson Simons, Deputy Assistant Director of the Laboratory Division, convened a

---

[6] Mr. Simpson constructed a report that she claims concluded that Ms. Cantamessa had actually "verbally assaulted" Plaintiff during the February 28, 2000 incident.  Pl.'s Ex. 11 (Simpson Report) at FBI-1004.  Plaintiff places heavy reliance on Mr. Simpson's "conclusions" and frequently asserts that he was wrongfully "shut out of the OPR process."  Pl.'s Opp'n at 27.  Three problems with Plaintiff's reliance on such claims.  First, there is no indication from the record that it is appropriate for an EEO counselor, who is supposed to be an independent investigator, to participate in the OPR disciplinary hearing.  *See* Def.'s Ex. 66 (EEOC, MD 110) at 3 ("The investigator does not make or recommend a finding of discrimination.") & 5 ("[T]he investigator must be and must maintain the appearance of being unbiased, objective, and thorough.").  Second, contrary to Plaintiff's assertion, Mr. Simpson's report does not conclude that Ms. Cantamessa "verbally assaulted" Plaintiff but simply summarizes matters of which Plaintiff complains.  *See* Pl.'s Opp'n at 27; Pl.'s Ex. 11 (Simpson Report) at 1004.  Third, there is no indication from the record that the EEO counselor had first-hand knowledge of the

meeting on July 18, 2000 to address the situation; attending the meeting were Ms. Simons, Ms.

Zeigler, Mr. Simpson, Ms. Cantamessa, Plaintiff, and her twin sister, Ms. Ferguson. *Id.*; *see also*

Def.'s Ex. 32 (7/19/00 FBI TDY for Plaintiff and her sister); Def.'s Ex. 33 (Plaintiff's

Chronology).   The next day, as requested at the meeting by Plaintiff, Plaintiff and her sister were

granted a request for a temporary duty assignment ("TDY") with the Information Evidence

Management Unit ("IEMU") and were assigned to a new work space to begin on July 24, 2000,

under the instruction of IEMU Unit Chief Mark Olson.  *Id.*¶ 28.[7]

Apparently happy with this outcome, Plaintiff expressed her appreciation to the July 18,

2000 meeting participants:

> I would like to thank each of you for your objectivity, consideration and assistance
> in the matter surrounding the TDY to the Information & Evidence Management
> Unit (IEMU).  I was allowed to voice my opinion and position, consideration was
> given to my request and action was taken.  I realize the entire matter has not been
> resolved.

Def.'s Ex. 34 (07/25/00 Email from Moore to Simons, et. al).  By communication dated

---

incidents leading to the disciplinary action; as such, any conclusory statements made in the report
regarding hostile work environment are hearsay, and Mr. Simpson would not be an appropriate
witness.

[7] Plaintiff claims that this new workspace -- Room 3658 -- "had poor ventilation and
other environmental problems" and that Plaintiff "observed black particles in the work area, and
the environmental conditions caused [P]laintiff to experience respiratory and health problems."
Pl.'s Opp'n at 11.  Plaintiff has provided no evidentiary support for this claim other than her own
subjective personal opinion as outlined in her Answer to Interrogatories; she has cited to no
independent studies of the room's purported environmental problems, no testimony from other
witnesses, and no documentation concerning any such issues.  Moreover, it is unclear whether
Plaintiff told anyone that she was unhappy with this space at the time after her reassignment there
in July 2000.  The Court further notes that while Plaintiff focuses on the "isolating" nature of this
new office, it was only "about four doors" apart from her previous office, "within the same
corridor [and] within the same closed space."  Def.'s Ex. 60 (Cantamessa Dep.) at 188:3-189:6.
The Court therefore finds that this allegation is also unsupported.  *See infra* § III.C.

July 25, 2000, Mr. Olston informed Plaintiff and her sister of their responsibilities during

the IEMU TDY, which were to include eliminating backlogged leads in the FBI's

Automated Case Support system.  Def.'s Ex. 35 (7/25/00 Olson Mem.).

On August 17, 2000, the FBI Director's Office announced a reorganization that mandated

the reassignment of all FBI Headquarters Information Technology personnel, equipment, and

programs to the Information Resources Division by October 1, 2000.  Def.'s Stmt. ¶ 30.  On

August 25, 2000, in response to the Director's mandate, the Laboratory Division identified

personnel who would be transferred to the Information Resources Division.  *Id.* ¶ 31.  Because of

her ongoing TDY to IEMU and her stated interest in work related to information technology,

Plaintiff and her sister were included on the list of Laboratory Division employees to be

transferred to the Information Resources Division.  *Id.*

On September 26, 2000, the Information Resources Division announced the

organizational and reporting lines of Information and Technology personnel assigned to the

Information Resources Division.  Def.'s Stmt ¶ 32.  Plaintiff and her sister were identified as

employees to be assigned to the Laboratory Automation Support Unit ("LASU") under the

supervision of Unit Chief Mr. Mark Olson.  *Id.*  Mr. Olson expressed concern that Plaintiff and

her sister were classified as Management Analysts, not Computer Specialists, and therefore did

not possess the qualifications needed to work in his unit.  *Id.* ¶ 33.  Mr. Olson therefore requested

that the Administrative Services Division rescind the transfer and that Plaintiff and her sister be

returned to the Laboratory Division.  *Id.* ¶ 34.[8]  The Administrative Services Division

_____

[8] According to Mr. Olson,

IRD is of the opinion that, through no fault of their own, Ms. Moore and Ms.

reestablished Plaintiff's and her sister's Management Analyst positions in the Laboratory

Division effective December 17, 2000.  Def.'s Ex. 54 (12/08/2000 Mem. from Administrative

Services to IRD).  On January 12, 2001, Mr. Olson informed Plaintiff and her sister of the

reassignment and notified them that they should report to Ms. Cantamessa on January 16, 2001.

Def.'s Ex. 41 (01/12/01 Email from Olson to Moore).

     E.     *LTAU TDY Assignment*

     In September or October 2001, Plaintiff volunteered her services to the FBI's Language

Training and Assessment Unit ("LTAU") to develop a database to track the testing and

processing of over 1,500 FBI applicants with Arabic language skills.  Def.'s Stmt. ¶ 35.

Following completion of the project, LTAU asked Plaintiff if she could be temporarily assigned

to the unit to perform additional database functions.  *Id.* ¶ 36.  Plaintiff's interest in a TDY to

LTAU came to the attention of Ms. Cantamessa, who was supportive of the idea.  *Id.* ¶ 37.  On

November 28, 2001, Plaintiff conveyed her acceptance of the TDY, but claimed that a

Memorandum of Understanding ("MOU") between the divisions was required before the TDY

could be implemented.  *Id.* ¶ 38.

     Plaintiff's support for her claim that an MOU was required is a September 19, 2001

--------

     Ferguson could not in any meaningful way, effectively nor efficiently dispatch the
     duties or support the roles that are demanded by the technical nature of the
     LSAU's responsibilities with computer hardware, software and networks.  In
     other words, these employees can neither successfully perform, nor be rated upon
     duties they are not currently qualified to undertake.  Further, IRD management
     cannot conceive relevant tasks within the framework of the technical duties of the
     LASU for which they could provide benefits to the Bureau's IT advancement
     efforts.

Def.'s Ex. 40 (10/24/00 Mem. from Information Resources to Administrative Services) at 2.

communication from the FBI's Administrative Services Division.  *Id.* at ¶ 39; Def.'s. Ex. 44

(Mem. from Administrative Services to All Divisions).  But that communication does not impose

an MOU requirement for TDYs with a duration of less than ninety (90) days like the one Plaintiff

was seeking.  *Id.*  On December 18, 2001, Plaintiff advised Language Services that, "I can no

longer perform volunteer work (TDY) on the Language Testing Program database project.  The

Laboratory Division did not formalize the TDY assignment."  Def.'s Stmt. ¶ 41 (quoting Def.'s

Ex. 46 (12/18/01 Email from Moore to Maria Brau, et. al.)).[9]

      F.      *Office Of The Ombudsman TDY*

Around June 2002, Plaintiff and FBI Ombudsman Ms. Sarah Zeigler discussed the

possibility of Plaintiff performing a TDY in the Office of the Ombudsman.  Def.'s Stmt. ¶ 42.

Ms. Ziegler's office had a need for an automated system to track the cases it worked on and an

employee in the office thought that Plaintiff had the expertise to create the needed database.  *Id.*

Either before or shortly after Plaintiff began assisting the Office of the Ombudsman, Ms. Zeigler

spoke with Ms. Pamela Sauer, Plaintiff's supervisor at the time, about the TDY.  *Id.* ¶ 43.  Ms.

Sauer did not object to Plaintiff helping with the system, but wanted her to remain available to

perform assignments from Ms. Sauer's unit.  *Id.* ¶ 44.

---

[9] Plaintiff claims that her supervisors "failed and refused to formalize the approval of the temporary duty request, causing [P]laintiff to lose out on the temporary assignment and be relegated to her regular status in the Laboratory Division, where Cantamessa continued to refuse to provide [P]laintiff work assignments."  Pl.'s Opp'n at 15.  The Court does not understand what led Ms. Moore to conclude that she could "no longer work on the . . . Language Testing Program database project."  Def.'s Ex. 46 (12/18/01 Email from Moore to Maria Brau, et. al.).  Plaintiff has provided no evidence that her superiors did anything to prevent her from taking on that temporary assignment, much less that they did so under the pretext of discrimination.  *See* Def.'s Ex. 48 (Documents and Correspondence Relating to TDY - Language Training and Assessment Unit) (series of emails regarding the TDY, culminating in Plaintiff's conclusory message that she could "no longer work" on the LTAU project).

On August 26, 2002, Plaintiff communicated with Ms. Sauer about formalizing the temporary duty arrangement with the Office of the Ombudsman. *Id.* ¶ 45.  Ms. Sauer advised Plaintiff that the person making the TDY request needed to prepare any MOU that would be required for the TDY.  *Id.*.  Plaintiff relayed this to Ms. Zeigler, who then asked Plaintiff to draft the MOU.  *Id.* ¶ 45.  Plaintiff then contacted the FBI's Performance Recognition and Awards Unit ("PRAU") regarding the MOU requirement.  *Id.* ¶ 46.  Plaintiff informed Ms. Zeigler that PRAU had told her that an MOU was not necessary and that all that was required was a communication ("EC") documenting the assignment.  *Id.*  Plaintiff offered to draft the EC and provided a draft EC to Ms. Zeigler on August 26, 2002.  *Id.*  The draft was for a TDY of an 18-20 month duration, a period proposed by Plaintiff which roughly approximated the time she had left until she was to retire from the FBI.  *See* Def.'s Ex. 53 (Ombudsman Docs.) at 2-4; Def.'s Ex. 47 (01/14/03 Zeigler Dep.) at 52-53.  However, Plaintiff never presented the EC or any other formal request to any Laboratory Division Management official, to include Mr. Hildebrand, Ms. Cantamessa, or Ms. Sauer, prior to her transfer to Quantico.  *Id.*; *see also* Def.'s Ex. 2 (12/17/02 Moore Dep.) at 77:10-15.

G.    *Change of Duty Station*

On September 5, 2002, before Plaintiff presented the required EC to any Laboratory Division managers for the TDY to the Office of the Ombudsman, she was notified that her duty station was being transferred to the new Laboratory Division facility at the FBI Academy in Quantico, VA.  Def.'s Stmt. ¶¶ 47-48.  On September 13, 2002, Plaintiff accepted the change of duty station and acknowledged that she was expected to report to Quantico on October 7, 2002. *Id.* ¶ 49.  In accepting the change of duty to Quantico, Plaintiff handwrote on the margins of her

acceptance form that she expected to "be granted permission to accept a TDY to the office of the ombudsman for a period of 18 to 20 months." Def.'s Ex. 50 (Doc. Indicating Pl.'s Acceptance of Change of Duty Station).

Decisions about when employees of the Laboratory Division were reassigned to the new facility were dictated by the construction schedule of the new facility. Def.'s Stmt. ¶ 50. Employees were generally given change of duty notices as their space in the new facility neared completion and as their responsibilities at FBI Headquarters in Washington diminished or the quality of work in Quantico demanded the assignment of new personnel on-site. *Id.* Plaintiff's assigned unit, the Administrative Unit, was to be located in the North Tower of the Quantico facility, which was the first of three towers to be completed and released for occupancy. *Id.* ¶ 51. At the time Plaintiff received her change of duty notice, the Administrative Unit had already transferred three (3) of its employees to Quantico. *Id.* ¶ 52. Six (6) other members of the unit received orders with the same reporting date as Plaintiff, although they did not ultimately report on that date since the North Tower was not yet ready for occupancy by that time. *Id.*

Although the North Tower was not yet ready for occupancy, there was, according to Ms. Sauer, a "pressing need for assistance in managing the massive amount of paperwork created by the construction project." Def.'s Ex. 51 (Sauer Decl.) ¶ 8. Prior to Plaintiff's arrival, this work was handled by a single employee who was occasionally helped by a colleague. *Id.* Ms. Sauer anticipated that Plaintiff would assist in managing the paperwork and could perform those duties in the office trailer where it was being managed. *Id.* ¶ 9. The duties included filing and matching punch lists from the on-sight inspections to include change orders and the coordination of a variety of construction related correspondence. *Id.*

During an introductory tour of the facility, Plaintiff complained of respiratory problems. Def.'s Stmt. ¶ 53.  On October 7, 2002, Plaintiff was assigned to an office trailer with air conditioning, heat, a private restroom, a refrigerator, a microwave, phone, fax service, a copier, and a computer.  *Id.* ¶ 54; Pl.'s Stmt. ¶ 12.[10]  Since February 2003, Plaintiff has been assigned to the new facility and no longer works out of the office trailer; as such, Plaintiff spent roughly four (4) months in the trailer.  Def.'s Stmt. ¶ 55.  Plaintiff claims that this transfer to Quantico caused her "an undue hardship" due to the fact that she lives 44 miles from Quantico and had to expend extra time and gas to arrive at work each day.  Pl.'s Opp'n at 18; Pl.'s Ex. 22 (10/4/02 email from Plaintiff to Zeigler); Pl.'s Ex. 1 (Pl.'s Answers to Interrogatories) at 13.

H.     *Performance Appraisal Reviews*

Ms. Cantamessa became Plaintiff's supervisor and rating official in April, 1999.  Def.'s Stmt. ¶ 56.  On January 14, 2000, Ms. Cantamessa rated Plaintiff for the ratings period from December 1, 1998 to November 30, 1999.  *Id.* ¶ 57.  Ms. Cantamessa rated Plaintiff Superior in Project Management, Fully Successful in Communication Skills, and Superior in Liaison, for a Summary Rating of Superior.  *Id.* ¶ 57.  Ms. Cantamessa did not present Plaintiff with a PAR for the rating period from December 1999 to November 2000.  *Id.* ¶ 58.  Under the FBI's Performance Management system, there was no requirement that an employee have on record a

---

[10] Plaintiff contends that the trailer was dirty and far removed from her co-workers, but her only support for this contention is, again, her own subjective personal opinion as set out in her Answers to Defendant's Interrogatories, Pl.'s Ex. 1 at 13-14.  She has provided no expert testimony regarding the alleged environmental problems in the trailer, no testimony garnered from other witnesses, and no independent documentation of any environmental issues.  In February 2003, Plaintiff was assigned to the new facility and moved out of the office trailer, meaning that her stay in the trailer lasted roughly four (4) months.  Def.'s Ex. 51 (Sauer Decl.) at ¶¶ 11-12.

PAR for the most current rating period in order to compete for promotions.  *Id.* ¶ 59.  On January

29, 2002, Ms. Cantamessa rated Plaintiff as "Meets Expectations" for each of her seven Critical

elements for a Summary Rating of "Meets Expectations."  *Id.* ¶ 61.  Plaintiff signed the PAR on

January 31, 2002.  *Id.*  Three considerations are relevant to the gaps in Plaintiff's PARs:  (1)

there was no requirement under the FBI's Performance Management System that the employee

have on record a PAR for the most current rating period in order to compete for promotions, *see*

Def.'s Ex. 57 (FBI's Manual of Admin. Operations and Procedures) Part 1, Section 7-4.1; (2)

Plaintiff never applied for a new position or a promotion during the relevant time period, and

instead contented herself with various TDYs, making her PARs less relevant, Def.'s Ex. 2

(12/17/02 Moore Dep.) at 59-61, 161-62; and (3) in the TDY situation, the employee's current

unit could provide a "closeout" rating for the time period covered by the TDY -- a logical

solution, given that the TDY unit spent more time with the employee during that time period,

which means that Ms. Cantamessa was not solely responsible for giving Plaintiff a PAR, Def.'s

Ex. 5 (01/17/02 Cantamessa Dep.) at 48-49.

   I.      *Assignments Provided*

       Plaintiff makes a generalized allegation that throughout her post-2000 period with the

FBI, she was not assigned "meaningful" work.  *See* Pl.'s Opp'n at 11,12-13, 19.  According to

Plaintiff, this problem arose after her brief IEMU TDY beginning in July 2000, continued

through her reassignment back to the Laboratory Division in December 2000, and plagued her

time at Quantico.  *Id.*  In particular, Plaintiff focuses on the period from February 2001 to

January 2001, a time period of nearly one (1) year during which Plaintiff claims that she

"received virtually no substantive work assignments," was thwarted by Ms. Cantamessa in her

attempts to obtain work elsewhere, and did not have a "single work-related discussion with" Ms.

Cantamessa after a February 1, 2001 meeting following Plaintiff's reassignment back to Ms.

Cantamessa's unit. *See id.* at 13.

Three considerations cast light on Plaintiff's claims. First, it is uncontested that Ms.

Cantamessa did not directly assign human resources work but instead tasked another employee to

make those assignments, and Plaintiff -- according to both her own testimony and that of Ms.

Cantamessa -- preferred not to speak to Plaintiff. *See* Def.'s Ex. 60 (01/17/02 Cantamessa Dep.)

at 56:16-57:15; Def.'s Ex. 61 (01/17/02 Moore Dep.) at 80:12-14 (Plaintiff notes that "my

relationship with my supervisor was such that I try to avoid her at all times"). Second, Plaintiff's

deposition indicates that she did receive numerous assignments during the relevant period,

including (1) a vacancy announcement for a physical science position located in the FBI's latent

fingerprint section, which was a three to four month project, Def.'s Ex. 61 (Moore Dep.) at

60:13-22, (2) several vacancy notices, *id.* at 62:4-5, (3) an update of an "R" chart, *id.* at 62:4-6,

(4) an Internet-based assignment, *id.* at 63:12-18, (5) a survey automation projection, *id.* at 65:1-

65:3, (6) a database project to track the funding staff level and support a hiring plan in the

Laboratory Division, *id.* at 68:20-25, and (7) a database for the FBI's Language Services

Division, *id.* at 70:11-15. Third, several of Plaintiff's supervisors -- including Ms. Cantamessa

and Mr. DeVincentis -- felt that it was a typical tactic of Plaintiff to refuse or avoid the work

assigned and then create a confrontation. *See* Def.'s Ex. 60 (01/17/02 Cantamessa Dep.) at

54:19-22 ("She refused to accept any assignments. We tried to get her new assignments for

additional postings and she said she would not accept any work from Neil as team leader.");

Def.'s Ex. 11 (DeVincentis Stmt.) at 4 ("this was a tactic utilized by Ms. Moore to either avoid

doing the work assigned to her or create a confrontation with UC Cantamessa"), 6 ("Once given

what she requests, she finds only faults with what she has and continues to conduct herself in an

unprofessional and confrontational manner."), 6-7 (once in the IEMU, Plaintiff completed her

initial assignments but "never sought additional work or attempted to become involved in any

way in the priority work of the IEMU"), 8 ("she was unable and unwilling to complete this and

other simple assignments").[11]

   *J.*  *Not Afforded an Opportunity to Work as the Acting Chief in Supervisor's Absence*

   Finally, Plaintiff contends that Ms. Cantamessa consistently gave "less qualified and less

experienced Caucasian employees preferential treatment in assignments, promotions,

promotional opportunities and awards, and required higher work standards from plaintiff than

from white employees."  Pl.'s Opp'n at 14.  Despite the fact that Plaintiff did not apply for any

vacancies or seek to change her position through anything other than TDYs, Plaintiff focuses on

allegedly preferential treatment given Ms. Cynthia Merrill, who was afforded increased pay,

exceptional rankings, and more responsibility; and Mr. Todd Rodgers, given a plum database

assignment for which Plaintiff believed herself to be better prepared.  *Id.*  Plaintiff also focuses

on the fact that she was never asked to serve as Acting Unit Chief when Ms. Cantamessa was

temporarily absent from work, whereas Ms. Merill -- who had less experience -- did serve as

Acting Unit Chief on one occasion.  *Id.*; *but see* Pl.'s Ex. 6 (01/17/02 Cantamessa Dep.) at 207-

08 (noting that "I don't officially name someone as acting. . . . I will have someone field my calls

---

[11] Plaintiff, in her Surreply, attempts to prove that she did not refuse assignments, and spends the majority of the Surreply on an effort to undermine the claims of Ms. Cantamessa and Mr. DeVincentis.  *See* Pl.'s Surreply at 1-6.  Regardless of whether Plaintiff actually refused assignments, failed to complete her assigned tasks, and generally shirked her responsibilities, it is uncontested that Ms. Cantamessa and Mr. DeVincentis actually believed that to be the case.

that come in," that she does not "refer to it as acting unit chief," that the position is rotated, and agreeing that Plaintiff -- the only GS-13 level African-American in the Unit -- was never the "acting chief").

Based on these above-listed events, Plaintiff -- in her Complaint and supplement -- alleges violations of Title VII (Count I) and the Rehabilitation Act (Count II).  Compl. at 7. Specifically, Plaintiff contends that she was subjected to race and gender discrimination and retaliation when: (1) she was "verbally assaulted" by Ms. Cantamessa in February, 2000, Compl. ¶ 7.a; (2) that incident was referred to the OPR for an investigation into misconduct, *Id.* ¶¶ 7.b, 8-10; (3) she was given what she found to be undesirable or unreasonable assignments and was "embarrassed" in the presence of her colleagues, *Id.* ¶ 7.d-e; (4) she was not given an opportunity to work as the acting chief in her supervisor's absence, Pl.'s Opp'n at 3, 14; (5) she was not given a PAR on one occasion and was "downgraded" in another PAR, Compl. ¶ 7.d; (6) when she was denied reasonable accommodation, *Id.* ¶ 7.g; (7) when she was denied two (2) requests for temporary duty and assignments, Supp. to Compl. ¶¶ 2-4; (8) and had her official duty station changed, *Id.* ¶¶ 5-7.  Plaintiff also claims that she was subjected to a hostile work environment, *id.* ¶ 7 and that the allegations in her Complaint constitute a "pattern or practice" of discrimination by the FBI against "African American and female employees of the FBI."  *Id.* ¶ 11.

## II: LEGAL STANDARDS

### A.    *Summary Judgment*

A party is entitled to summary judgment if the pleadings, depositions, and affidavits demonstrate that there is no genuine issue of material fact in dispute and that the moving party is

entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c); *Tao v. Freeh*, 27 F.3d 635, 638

(D.C. Cir. 1994).  Under the summary judgment standard, Defendant, as the moving party, bears

the "initial responsibility of informing the district court of the basis for [its] motion, and

identifying those portions of the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits which [it] believe[s] demonstrate the absence of a

genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91

L.Ed.2d 265 (1986).  Plaintiff, in response to Defendants' motion, must "go beyond the pleadings

and by [his] own affidavits, or depositions, answers to interrogatories, and admissions on file,

'designate' specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal

citations omitted).

Although a court should draw all inferences from the supporting records submitted by the

nonmoving party, the mere existence of a factual dispute, by itself, is not sufficient to bar

summary judgment.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91

L.Ed.2d 202  (1986).  To be material, the factual assertion must be capable of affecting the

substantive outcome of the litigation; to be genuine, the issue must be supported by sufficient

admissible evidence that a reasonable trier-of-fact could find for the nonmoving party.

*Laningham v. U.S. Navy*, 813 F.2d 1236, 1242-43 (D.C. Cir. 1987); *Liberty Lobby*, 477 U.S. at

251, 106 S.Ct. 2505 (the court must determine "whether the evidence presents a sufficient

disagreement to require submission to a jury or whether it is so one-sided that one party must

prevail as a matter of law"). "If the evidence is merely colorable, or is not sufficiently probative,

summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50, 106 S.Ct. 2505

(internal citations omitted). "Mere allegations or denials in the adverse party's pleadings are

insufficient to defeat an otherwise proper motion for summary judgment." *Williams v. Callaghan*, 938 F. Supp. 46, 49 (D.D.C. 1996).  The adverse party must do more than simply "show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).  Instead, while the movant bears the initial responsibility of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact, the burden shifts to the non-movant to "come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Id.* at 587, 106 S.Ct. 1348 (citing Fed. R. Civ. P. 56(e)) (emphasis in original).

Importantly, "[w]hile summary judgment must be approached with specific caution in discrimination cases, a plaintiff is not relieved of her obligation to support her allegations by affidavits or other competent evidence showing that there is a genuine issue for trial." *Morgan v. Fed. Home Loan Mortgage Corp.*, 172 F. Supp. 2d 98, 104 (D.D.C. 2001) (quoting *Calhoun v. Johnson*, No. 95-2397, 1998 WL 164780, at *3 (D.D.C. Mar. 31, 1998) (internal citation omitted), *aff'd*, No. 99-5126, 1999 WL 825425, at *1 (D.C. Cir. Sept. 27, 2000)); *see also Marshall v. James*, 276 F. Supp. 2d 41, 47 (D.D.C. 2003) (special caution "does not eliminate the use of summary judgment in discrimination cases") (citing cases).  "Summary judgment is not a 'disfavored procedural shortcut,' but is an integral procedural tool which promotes the speedy and inexpensive resolution of every case." *Marshall*, 276 F. Supp. 2d at 47 (quoting *Celotex Corp.*, 477 U.S. at 327).  Accordingly, the Court reviews the defendant's motion for summary judgment under a "heightened standard" that reflects "special caution." *Aka*, 116 F.3d at 879 (internal quotations omitted).  Nonetheless, while this special standard is more exacting, it is not inherently preclusive.  Although more circumspect, the Court will continue to grant a

motion for summary judgment in which the nonmoving party has failed to submit documents that
create a genuine factual dispute and the moving party is entitled to a judgment as a matter of law.

   B.    *Discrimination Claims*

   Defendant seeks summary judgment on Plaintiff's discrimination claims.  As noted at the
onset, Plaintiff brings this action pursuant to Title VII, which states that all personnel actions
affecting employees "shall be made free from any discrimination based on race, color, religion,
sex, or national origin."  42 U.S.C. § 2000e-16(a).  It is uncontested that Plaintiff was an
employee during the relevant time period and Defendant is an employer within the meaning of
Title VII.  The Court exercises jurisdiction over Plaintiff's claim according to 28 U.S.C. § 1331.

   To prove a Title VII disparate treatment claim, Plaintiff must demonstrate by a
preponderance of the evidence that the actions taken by the employer were "more likely than not
based on the consideration of impermissible factors" such as race or gender.  *Tex. Dep't of Cmty.
Affairs v. Burdine*, 450 U.S. 248, 254, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981) (internal
quotation marks and citation omitted).  Where, as here, the record contains no direct evidence of
discrimination, it is necessary to employ the *McDonnell Douglas* tripartite burden-shifting
framework.  *Cones v. Shalala*, 199 F.3d 512, 516 (D.C. Cir. 2000) (citing *McDonnell Douglas v.
Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 ( 1973)).  It is the district court's
responsibility to closely adhere to this analysis and go no further, as it does not sit as a "super-
personnel department that reexamines an entity's business decisions."  *Fischbach v. D.C. Dep't
of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (internal citation and quotation marks omitted).

Under the *McDonnell Douglas* paradigm, Plaintiff has the initial burden of proving by a preponderance of the evidence a "*prima facie*" case of discrimination. 411 U.S. at 802, 93 S. Ct. 1817. In the D.C. Circuit, to establish a *prima facie* case of discrimination under Title VII, Plaintiff must show that: "(1) she is a member of a protected class; (2) she suffered adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination." *Brown v. Brody*, 199 F.3d 446, 452 (D.C. Cir. 1999); *accord Stella v. Mineta*, 284 F.3d 135, 145 (D.C. Cir. 2002).

If she succeeds establishing a *prima facie* case, the burden shifts to Defendant to articulate some legitimate, non-discriminatory reason for Plaintiff's non-selection, and to produce credible evidence supporting his claim. *McDonnell Douglas*, 411 U.S. at 802, 93 S. Ct. 1817. Defendant's burden is only one of production, and it "need not persuade the court that it was actually motivated by the proffered reasons." *Burdine*, 450 U.S. at 254, 101 S. Ct. 1089; *see also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993) ("[T]he determination that a defendant has met its burden of production (and has thus rebutted any legal presumption of intentional discrimination) can involve no credibility assessment."). As such, "the *McDonnell Douglas* framework shifts intermediate evidentiary burdens between the parties, [t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Morgan v. Fed. Home Loan Mortgage Corp.*, 328 F.3d 647, 651 (D.C. Cir. 2003), *cert. denied*, 540 U.S. 881, 124 S. Ct. 325, 157 L.Ed.2d 146 (2003); *see also Burdine*, 450 U.S. at 253, 101 S. Ct. 1089.

If Defendant is successful, then "the *McDonnell Douglas* framework -- with its presumptions and burdens -- disappear[s], and the sole remaining issue [is] discrimination *vel non*." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142-43, 129 S. Ct. 2097, 147 L. Ed. 2d 105 (2000) (internal citations and quotation marks omitted). At that point, Plaintiff has the burden of persuasion to show that defendant's proffered reason was not the true reason for the employment decision. *Burdine*, 450 U.S. at 256, 101 S. Ct. 1089. Pretext may be established "directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.* at 256; *see also Reeves*, 530 U.S. at 143, 129 S. Ct. 2097. "Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive." *Reeves*, 530 U.S. at 147, 129 S. Ct. 2097 (citing *St. Mary's Honor Ctr.*, 509 U.S. at 517, 113 S. Ct. 2742 ("[P]roving the employer's reason false becomes part of (and often considerably assists) the greater enterprise of proving that the real reason was intentional discrimination."); *see also Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1290 (D.C. Cir. 1998) (en banc) ("[A] plaintiff's discrediting of an employer's stated reason for its employment decision is entitled to considerable weight.").

Notably, the Supreme Court has taken care to instruct trial courts that "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves*, 530 U.S. at 148, 129 S. Ct. 2097. "[T]he trier of fact may still consider the evidence establishing the plaintiff's prima facie case 'and inferences properly drawn therefrom . . . on the issue of whether the defendant's explanation is pretextual." *Id.* at 143 (quoting *Burdine*, 450 US at 255

32

n.10, 101 S. Ct. 1089 ).  The Court of Appeals has distilled this analysis, noting that the jury can

infer discrimination from the combination of:

> (1) the plaintiff's *prima facie* case; (2) any evidence the plaintiff presents to attack
> the employer's proffered explanation for its actions; and (3) any further evidence
> of discrimination that may be available to the plaintiff (such as independent
> evidence of discriminatory statements of attitudes on the part of the employer) or
> any contrary evidence that may be available to the employer (such as evidence of
> a strong record in equal opportunity employment).

*Aka*, 156 F.3d at 1289.  However, evidence in each of the three (3) categories is not required.  *Id.*

"At this stage, if [plaintiff] is unable to adduce evidence that could allow a reasonable

trier of fact to conclude that [defendant's] proffered reason was a pretext for discrimination,

summary judgment must be entered against [plaintiff]."  *Paquin v. Fed. Nat'l Mortgage Ass'n*,

119 F.3d 23, 27-28 (D.C. Cir. 1997).  "[T]he court must consider all the evidence in its full

context in deciding whether the plaintiff has met his burden of showing that a reasonable jury

could conclude that he has suffered discrimination."  *Aka*, 156 F.3d at 1290.

### C.    Retaliation

Title VII not only prohibits federal agencies from discriminating on the basis of race

and/or gender, 42 U.S.C. § 2000e-16, it also prohibits them from retaliating against employees

for the assertion of their rights under Title VII.  *See Forman v. Small*, 271 F.3d 285, 297 (D.C.

Cir. 2001), *cert. denied*, 536 U.S. 958, 122 S.Ct. 2661, 153 L.Ed.2d 836 (2002).  To establish a

*prima facie* case of retaliation, Plaintiff must show that: (1) she engaged in a statutorily protected

activity; (2) the employer took an adverse personnel action; and (3) a causal connection exists

between the protected activity and the adverse action.  *See Morgan*, 328 F.3d at 651; *Holbrook v.*

*Reno*, 196 F.3d 255, 263 (D.C. Cir. 1999).  If plaintiff establishes a *prima facie* case of

retaliation, the analysis then follows as that for a discrimination claim.  *See, e.g.*, *Freedman v. MCI Telecommunications Corp.*, 255 F.3d 840, 844-845 (D.C. Cir. 2001).

       *D.*       *The Rehabilitation Act*

The Rehabilitation Act of 1973, 29 U.S.C. § 794a, allows qualified disabled federal employees to sue their employers when they have been subjected to discrimination.  The standards for determining an employment-related violation of the Rehabilitation Act are the same standards used for a similar violation of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. 12111 *et seq.*  29 U.S.C. § 794(d).  The D.C. Circuit applies the *McDonnell Douglas* burden shifting test to ADA discrimination cases where the plaintiff "offers no direct evidence tending to show discriminatory animus and the defendant denies that its decisions were motivated by the plaintiff's disability."  *Marshall v. Federal Express Corp.*, 130 F.3d 1095, 1099 (D.C. Cir. 1997); *see also Aka*, 116 F.3d at 885-86; *Barth v. Gelb*, 2 F.3d 1180, 1186 (D.C. Cir. 1993).  Thus, in order to make a *prima facie* case under the Rehabilitation Act, Plaintiff must show that she (1) is a disabled person within the meaning of the Act; (2) is qualified to perform the essential functions of the job without reasonable accommodation; and (3) suffered an adverse employment decision because of his or her disability.  *Dorchy v. Washington Metropolitan Area Transit Auth.*, 45 F. Supp. 2d 5, 10 (D.D.C. 1999) (internal citations omitted).

### III: DISCUSSION

      *A.*      *Plaintiff Fails To Show Adverse Employment Action For Most Claims*

It is undisputed that Plaintiff is a member of a protected class under Title VII or suffers from a disability.  Therefore, the Court moves to the next step required to establish a *prima facie* case for Plaintiff's discrimination, retaliation and Rehabilitation Act claims, the question of

whether Plaintiff has shown adverse employment actions sufficient to establish a *prima facie*

case.  With the exception of her discrimination claim relating to the disciplinary action taken by

the FBI's OPR and her transfer to Quantico, Virginia, the Court finds that Plaintiff has failed to

show that she suffered from an adverse employment action.  This failure is fatal to Plaintiff's

other Title VII and Rehabilitation Act claims detailed in Counts I and II of her complaint, Compl.

at 7, each of which require an adverse employment action as an element of the *prima facie* case.

To establish an adverse employment action in the absence of a diminution

in pay or benefits, Plaintiff must show an action with "materially adverse consequences affecting

the terms, conditions, or privileges of employment." *Brown*, 199 F.3d at 457.  The employment

decision must inflict "objectively tangible harm." *Russell v. Principi*, 257 F.3d 815, 818 (D.C.

Cir. 2001) (recognizing that this requirement "guards against both judicial micromanagement of

business practices, and frivolous suits over insignificant slights") (internal quotation omitted).

"An employment decision does not rise to the level of an actionable adverse action . . . unless

there is a tangible change in the duties or working conditions constituting a material employment

disadvantage." *Stewart v. Evans*, 275 F.3d 1126, 1134 (D.C. Cir. 2002) (internal quotations

omitted); *see also Russell*, 257 F.3d at 818 ("[N]ot everything that makes an employee unhappy

is an actionable adverse action.  Minor and even trivial employment actions that an irritable,

chip-on-the-shoulder employee did not like would otherwise form the basis of a discrimination

suit.") (citations and internal quotation omitted).  "A tangible employment action constitutes a

significant change in employment status, such as hiring, firing, failing to promote, reassignment

with significantly different responsibilities, or a decision causing a significant change in

benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761, 118 S. Ct. 2257, 141 L.Ed.2d

35

633 (1998).

However, as the D.C. Circuit has explained,

> [T]he burden of establishing a prima facie case is 'not onerous.' Its function is limited to eliminating the two most common nondiscriminatory reasons for a plaintiff's rejection: 'an absolute or relative lack of qualifications or the absence of a vacancy in the job sought.' Elimination of these reasons for refusal to hire . . . is sufficient, absent other explanation, to create an inference that the decision was a discriminatory one.

*Cones*, 199 F.3d at 516 (internal citations omitted).

Plaintiff argues that her claims for discrimination and retaliation are "not based on isolated incidents, but rather on the totality of [her] unfortunate workplace experience." Pl.'s Opp'n at 32. Plaintiff is critical of Defendant's Motion for Summary Judgment, which she describes as an attempt to "cherry-pick each individual potential action and hold each up against the standard of 'adverse employment action' one at a time." *Id.* at 35. To support her argument that the Court should examine the accumulation of the allegations contained in Plaintiff's Complaint to determine whether they demonstrate, in their totality, the discrimination that Plaintiff alleges, Plaintiff cites *Higbee v. Billington*, 246 F. Supp. 2d. 10, 14 (D.D.C. 2003). *See* Pl.'s Opp'n at 34-35. In *Higbee*, Magistrate Judge John Facciola, relying on *Freedman*, 255 F.3d 840, stated that "[a] series of indignities can accumulate over time creating a radical transformation of one's entire work experience." *Id.* But the *Freedman* court examined the plaintiff's eight (8) discrimination claims in a claim-by-claim analysis to determine whether or not they each showed an adverse employment action. *Freedman*, 255 F.3d at 843-49.

Only after assessing each of the individual complaints did the *Freedman* court conclude that "summary judgment was appropriate because each of the activities complained of, taken

alone or collectively, fails to rise to the level of an adverse employment action, lacks evidence of

disparate treatment or both." *Id.* at 844. As in that case and consistent with the approach of the

D.C. Circuit, the Court begins by examining each of the Plaintiff's claims and identifying those

claims that do not demonstrate an adverse employment action. *See also Carter v. George*

*Washington Univ.*, 387 F.3d 872, 878 (D.C. Cir. 2004) (applying *McDonnell Douglas* framework

to each of three (3) alleged instances of discrimination in the denial of a promotion); *Stewart*,

275 F.3d at 1134-1136 (examining plaintiffs five (5) retaliation claims in turn to determine

whether they contained adverse employment actions). The Court will then discuss those claims

that rise to the level of an adverse employment action to determine whether Defendant has

articulated some legitimate, non-discriminatory reason for its action.

　　　　　1.　　　Verbal assault

Plaintiff claims that during the February 28, 2000 disagreement between Plaintiff and Ms.

Cantamessa over the posting of the secretarial vacancy announcement, Ms. Cantamessa verbally

"assault[ed]," Pl.'s Opp'n at 9, her when she allegedly told Plaintiff to "get out of her face."

Def.'s Ex. 2 (12/17/02 Moore Dep.) at 105:14-105:22. Even if Ms. Cantamessa did tell Plaintiff

to "get out of her face," a single verbal dispute with an employer does not, in and of itself,

constitute an adverse employment action except under the most "extraordinary circumstances."

*Bunyon v. Henderson*, 206 F. Supp. 2d 28, 30 (D.D.C. 2002). "While the D.C. Circuit has not

reached this issue, it is clear that merely being yelled at by your supervisor does not rise to the

level of an adverse employment action." *Russ v. Van Scoyoc Assocs., Inc.*, 122 F. Supp. 2d 29,

32 (D.D.C. 2000) (citing *Burlington Indus., Inc.* 524 U.S. at 761, 118 S. Ct. 2257); *Sullivan-Obst*

*v. Powell*, 300 F. Supp. 2d 85, 93-94 (D.D.C. 2004). The Court agrees with Judge Royce

Lamberth's conclusion in *Russ*.  An isolated dispute even when termed as a "verbal assault" is

not an adverse employment action, especially in a situation such as this in which it is uncontested

that Plaintiff approached Defendant in an inappropriately aggressive manner.  Def.'s Stmt. ¶ 3.  It

is obvious that Plaintiff and Ms. Cantamessa got into an argument, but that does not amount to an

adverse employment action, which requires a significant change in employment status or a

tangible change in the duties or working conditions that constitutes a material employment

disadvantage.

### 2.    Referral of alleged misconduct to the OPR

Ms. Cantamessa reported the February 28, 2000 incident to the OPR.  Def.'s Stmt. ¶ 3.

OPR then notified the Laboratory Division that an inquiry had been initiated on Ms.

Cantamessa's allegation that Plaintiff had acted unprofessionally and disrupted the workplace by

attempting to physically threaten her and failing to perform a work assignment as instructed by

her supervisor.  Def.'s Stmt. ¶ 4.  On March 20, 2000, OPR requested that the Laboratory

Division investigate the allegations in Ms. Cantamessa's referral.  Def.'s Stmt. ¶ 5.  Plaintiff

claims that Ms. Cantamessa's referral included fabricated statements and that the act of referring

the complaint to OPR was an adverse employment action.  Compl. ¶ 7.b; Opp'n at 23.

A referral alone, without more, to the OPR alleging possible misconduct by an employee

is not "a tangible employment action constitut[ing] a significant change in employment status,

such as hiring, firing, failing to promote, reassignment with significantly different

responsibilities, or a decision causing a significant change in benefits," and therefore cannot be

an adverse personnel action.  *Burlington Indus.*, U.S. at 761, 118 S. Ct. 2257; *see also Forkkio v.*

*Powell*, 306 F. 3d 1127, 1131 (D.C. Cir. 2002); *Brown* 199 F.3d at 457.  As the Fourth Circuit

38

has noted, "there are many interlocutory or mediate decisions having no immediate effect upon employment conditions which were not intended to fall within . . . Title VII." *Page v. Bolger*, 645 F.2d 227, 233 (4th Cir. 1981) (en banc) (holding that decisions such as those concerning the composition of review committees are "simply steps in a process for making such obvious end-decisions as those to hire, to promote, etc."); *accord Taylor v. FDIC*, 132 F.3d 753, 764 (D.C. Cir. 1997); *Dollis v. Rubin*, 77 F.3d 777, 781-82 (5th Cir. 1995); *Walker v. Washington Metropolitan Area Transit Auth.*, 102 F. Supp. 2d 24, 28 (D.D.C. 2000); *but see Hayes v. Shalala*, 902 F. Supp. 259, 266-67 (D.D.C. 1995) ("Title VII claims are not limited to final employer actions or decisions that have a lasting effect on an employee's record.  Hostile work environment claims, for example, need not allege tangible or economic losses . . . .").

"While this circuit has not exhaustively defined what constitutes an adverse employment action under Title VII, 'courts have consistently focused on ultimate employment decisions such as hiring, granting leave, promoting, and compensating . . . [and not] interlocutory or intermediate decisions having no immediate effect upon employment decisions.'" *Walker*, 102 F. Supp. 2d at 28 (quoting *Taylor* 132 F.3d at 764).  The OPR referral and review process is designed to deal with incidents such as the one that took place between Plaintiff and Ms. Cantamessa in February 2000.  It is necessarily an interlocutory process and not an ultimate employment decision.  Nothing in the pleadings indicates that Ms. Cantamessa's referral of the matter to OPR had any immediate impact upon Plaintiff or that Plaintiff's employment situation was adversely affected by the investigation.  The referral does not itself have a tangible impact on Plaintiff's pay, position, benefits, or promotional opportunities.  It therefore does not constitute an adverse action under Title VII.

3.      Unreasonable work deadlines and accusations of unacceptable work performance

In her deposition, Plaintiff testified to several examples of assignments given to her by Ms. Cantamessa that she claimed had unreasonable deadlines, either because they had short turn-around requirements or involved a high volume of work.  Def.'s Ex. 2 (12/17/02 Moore Dep.) at 110:14-112:22.  Plaintiff also testified that Ms. Cantamessa accused her of unacceptable work performance between 1999 and 2002. *Id.* at 114:13-115:13.  Even if true, these allegations do not constitute adverse actions sufficient to maintain a discrimination or retaliation claim. "[C]hanges in assignments or work-related duties do not ordinarily constitute adverse employment decisions if unaccompanied by a decrease in salary or work hour changes." *Mungin v. Katten, Muchin & Zavis*, 116 F.3d 1549, 1557 (D.C. Cir. 1997) (citing *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 886-87 (6th Cir. 1996)); *Crady v. Liberty Nat'l Bank & Trust Co. of Ind.*, 993 F.2d 132, 136 (7th Cir. 1993); *see also Mack v Strauss*, 134 F. Supp. 2d 103, 113-14 (D.D.C. 2001) (holding that increased workload unaccompanied by some adverse change in the terms, conditions or privileges of employment did not constitute an actionable injury).  "Mere inconveniences and alteration of job responsibilities will not rise to the level of adverse action." *Stewart*, 275 F.3d at 1135 (internal citation and internal quotation marks omitted).

Employers are given discretion to assign work equally to qualified employees as long as "'the decision is not based upon unlawful criteria.'" *Mungin*, 116 F.3d at 1557 (quoting *Burdine*, 450 U.S. at 259, 101 S. Ct. 1089 ).  In this case, a jury could have no factual basis for concluding that the deadlines given to Plaintiff, the substance of her assignments, or Ms. Cantamessa's alleged criticism's of Plaintiff's work was based on unlawful criteria.  Nothing in the pleadings could sustain such a claim and those allegations cannot, therefore, constitute an adverse

employment action.

### 4. Harassment and embarrassment in front of co-workers

Plaintiff also contends that Ms. Cantamessa "embarrassed" her in front of her colleagues. Compl. ¶ 7.d; Pl.'s Opp'n at 7. Plaintiff's deposition identifies three (3) such occasions: August 1999, February 2000, and the summer of 2002, on which Plaintiff claims that she was embarrassed by Ms. Cantamessa, who had requested the presence of a witness when she presented Plaintiff with documentation concerning her work performance. Def.'s Ex. 2 (12/17/02 Moore Dep.) at 115:13-119:3. The alleged incidents of embarrassment, either taken individually or collectively, do not constitute an adverse employment action.

Even if the presence of a coworker at a meeting between Plaintiff and her supervisor could be found to be "embarrassing" to Plaintiff, such a decision by Ms. Cantamessa did not adversely impact the terms, conditions or privileges of plaintiff's employment or her future employment opportunities as required to establish an adverse employment action under *Brown*. 199 F.3d at 457. Even assuming *arguendo* that Ms. Cantamessa's behavior amounted to a public embarrassment of Plaintiff (the Court finds it impossible to see three (3) alleged instances of a supervisor requesting the presence of another employee at a meeting to be public embarrassment), there is still not an adverse employment action. The D.C. Circuit has held that even public humiliation or loss of reputation -- without other adverse consequences -- do not constitute adverse employment actions under Title VII. *See Stewart* 275 F.3d at 1136. Based on that standard and the lack of evidence to support her claim, Plaintiff has not demonstrated any adverse employment action resulting from Ms. Cantamessa decision to have another FBI employee present at the three identified meetings.

5.     Denied opportunity to work as acting chief supervisor

Plaintiff alleges that Caucasian employees were provided preferential treatment.  Compl.

¶ 7.f.  At the center of this allegation is Plaintiff's contention that she was denied the opportunity

to work as the acting chief in her supervisor's absence.  Pl.'s Opp'n at 3, 14.  In support of this

argument, Plaintiff cites to Ms. Cantamessa's deposition at which she stated that Plaintiff has

"never been acting chief."  Pl.'s Ex. 6 (01/17/02 Cantamessa Dep.) at 208:19; *see* Pl.'s Opp'n at

14.

In her Opposition, Plaintiff claims that she "was not designated as acting Unit Chief even

once by either Cantamessa or Sauer during their many absences from the unit."  Pl.'s Opp'n at 3.

While it unclear whether Plaintiff's Unit actually had an "acting Unit Chief" during Ms.

Cantamessa's absences, *see* Pl.'s Ex. 6 (01/17/02 Cantamessa Dep.) at 207-08 (noting that "I

don't officially name someone as acting. . . . I will have someone field my calls that come in,"

that she does not "refer to it as acting unit chief," that the position is rotated, and agreeing that

Plaintiff -- the only GS-13 level African-American in the Unit -- was never the "acting chief"), it

is clear that courts have consistently held that such claims do not rise to the level of an adverse

action unless accompanied by a tangible change in employment.  *Taylor*, 132 F.3d at 764

(temporary designation as acting section head is not contemplated as adverse employment action

affecting the terms, conditions, or privileges of employment); *Stewart* 275 F.3d at 1135

("Because denial of . . . temporary designation is not an adverse employment action, mere

interference with or delay of such a designation cannot be a cognizable harm under Title VII.");

*see also Erves v. City of Dallas*, Civ. No. 03-0096, 2004 WL 904122, at *5-*6 (N.D. Tex. Apr.

27, 2004) (denial of temporary duty as instructor not an adverse employment action).  As such,

even if Ms. Cantamessa did name other individuals as "Acting Unit Chief" instead of Plaintiff,

Plaintiff's claim that she was wrongfully denied this temporary employment designation cannot

therefore rise to the level of an adverse employment action.  Moreover, given the fact that

Plaintiff was often working on TDYs, actively involved with other projects, or stationed

temporarily in Quantico, it is perhaps unsurprising that Plaintiff was not afforded the opportunity

to assist Ms. Cantamessa during her absences as an unofficial "Acting Unit Chief" during this

time period.

### 6.   Performance appraisals

Ms. Cantamessa rated Plaintiff for the annual rating periods ending in November 1999

and November 2001.  Def.'s Stmt. ¶¶ 56-61.  Ms. Cantamessa did not provide Plaintiff with a

PAR for the annual period ending November 2000.  *Id.* ¶ 58.  Plaintiff alleges that Ms.

Cantamessa's failure to provide a review for the period ending November 2000 and her alleged

downgrading of Plaintiff on her PAR for the November 1999 period constitute an adverse

employment action.  Compl. ¶ 7.d.

Under FBI regulations, there was no requirement that an employee have a PAR from the

most current rating period in order to compete for promotions.  Def.'s Stmt. ¶ 59.  Plaintiff has

not identified any FBI regulation or policy providing that the failure to be rated for any given

rating period will have an adverse impact on employee's employment status.  Once again,

because the lack of a rating did not affect Plaintiff's employment situation, it cannot be an

adverse employment action.  The same is true for the "downgraded" PAR for the period ending

November 1999.[12]

The D.C. Circuit has held that a performance evaluation, negative or otherwise, is not an adverse action unless it affects the employee's grade or salary. *Brown*, 199 F.3d at 458. As in *Brown*, while Plaintiff's evaluation may have been lower than past evaluations, it was "not adverse in the absolute sense." *Id.* Plaintiff has not shown that the 1999 PAR affected her grade or salary and according to the FBI's own regulation, it did not affect her future employment possibilities. This was an evaluation that was given to Plaintiff as part of the normal course of employment, not an adverse employment action sufficient to establish a *prima facie* case of discrimination.

7.      Lack of work assignments

Plaintiff claims that her "most pervasive work condition was no work at all," that she was assigned "virtually no substantive work assignments" and that Ms. Cantamessa "actively thwarted [her] attempts to work elsewhere." Pl.'s Opp'n at 13. Specifically, Plaintiff contends that she received no "meaningful work" while on her six (6)-month TDY to IEMU in 2000, that upon Plaintiff's return to her unit, she and Ms. Cantamessa did not have work-related discussions, and that she did not receive any work assignments during 2001-2002. Pl.'s Opp'n at

---

[12] For an employee seeking promotion or a position offering promotion potential, the only requirement is that the employee possess at least a Fully Successful rating in each critical element of her most recent PAR. Def.'s Ex. 57, (Manual of Adminstrative Operations and Procedures § 7-4.1). Although Plaintiff did not receive a rating for the period ending November 2000, she could have used her rating from the November 1999 period (in which she was rated Superior in Project Management, Fully Successful in Communication Skills, and Superior in Liaison), Def's Stmt. ¶ 57, for the purposes of promotion during the period that ended in 2000. Moreover, Plaintiff was not prejudiced in any way by any gaps in her PARs, as it is uncontested that she did not apply for any promotions or step increases during the relevant time. *See* Def.'s Ex. 2 (12/17/02 Moore Dep.) at 59-61, 161-62.

11-13.  She also expressed dissatisfaction with a two (2)-month period related to her

reassignment to the FBI's IRD from October 2000 to December 2000 and the work that she was

initially assigned when transferred to Quantico which she found to be "menial."  *Id.* at 12 and 18.

Citing a variety of cases, *see, e.g. Singletary v. Dist. of Columbia*, 225 F. Supp. 2d 43, 56-57

(D.D.C. 2002) (work assignments that precluded advancement opportunities constitutes adverse

employment), Plaintiff claims that her lack of assignments or substantive work substantially

atrophied her skills and injured her career.  *Id.* at 36-37.

 Importantly, three facts completely undermine Plaintiff's argument.  <u>First</u>, it is

uncontested that during the relevant time period, Plaintiff did not submit an application for any

positions within the FBI or promotions that would have provided her with a step increase.  *See*

Def.'s Ex. 2 (12/17/02 Moore Dep.) at 59-61, 161-62.  As such, even assuming *arguendo* that

Plaintiff was given either meaningless work or simply no work, Plaintiff cannot show any

professional harm to her career prospects.  Simply, even accepting Plaintiff's assertions as true,

the alleged lack of quantity and quality in her assignments had no causal impact on her progress:

she has not alleged, nor has she proven, any denial of a promotion or pay raise due to her

assignments.

 <u>Second</u>, Plaintiff's allegations are contradicted by the record.  Plaintiff was clearly given

work during both the IRD assignment and when she reached Quantico.  *See* Def.'s Ex. 61

(12/17/02 Moore Dep.) at 60-70.  Her tasks might have been different after these transfers, but

"[t]he D.C. Circuit has held that minor changes in work-related duties or opportunities do not

constitute an actionable injury unless they are accompanied by some other adverse change in the

terms, conditions or privileges of employment."  *Stewart,* 275 F.3d at 1135 (citing *Brown*, 199

45

F.3d at 457).  Because "changes in assignments and work-related duties do not ordinarily constitute adverse employment actions if unaccompanied by a decrease in salary or work hour changes," a change in assignment, such as the one alleged by Plaintiff, that is neither accompanied by a decrease in salary nor work hour changes cannot rise to that level.  *Mungin*, 116 F.3d at 1557; *see also Stewart*, 275 F.3d at 1135 ("Mere inconveniences and alteration of job responsibilities will not rise to the level of adverse action.") (internal citation and internal quotation marks omitted).

With respect to the IEMU detail, which Plaintiff had been assigned at her own request, Plaintiff was assigned the task of eliminating 4,000 backlogged leads in the FBI's Automated Case Support System.  *See* Def.'s Ex. 35 (12/25/2000 Memo. from Laboratory to Laboratory). While Plaintiff apparently did not like this new task, she has not shown, nor has she attempted to show, that this change in her duties was accompanied by a decrease in salary or work hour changes.  It therefore cannot constitute an adverse employment action.  *See, e.g., Mungin,* 116 F.3d at 1556-57.  The same is true for Plaintiff's responsibilities upon the transfer to Quantico, where she was assigned the task of assisting with the paperwork involved with the construction project.  *See supra* § I.G.  "An employer has discretion to assign work to equally qualified employees so long as the decision is not based upon unlawful criteria." *Mungin*, 116 F.3d at 1557 (internal citations and quotation marks omitted).  Based on the proffered evidence, a reasonable trier of fact could not conclude that the decision to transfer Plaintiff to Quantico or the work that she was assigned when she got there was based on unlawful criteria.

Plaintiff's allegation that she and Ms. Cantamessa did not have any work-related discussions after her return to Ms. Cantamessa's unit in February 2001, is also contradicted by

the record.  According to both Plaintiff and Ms. Cantamessa,  Plaintiff and Ms. Cantamessa had

what can generously be described as a dysfunctional working relationship.  Def.'s Ex. 60

(01/17/02 Cantamessa Dep.) at 56:19-56:20 ("Ms. Moore prefers not to talk to me."); Def.'s Ex.

61 (12/17/02 Moore Dep. 80:12-80:16) ("Because my relationship with my supervisor was such

that I try to avoid her at all times because most of the time every experience that I have with

Janet usually is she treats me in an unprofessional manner.").  But despite this relationship, the

record shows that Plaintiff had numerous work related discussions with Ms. Cantamessa, team

leaders, or other supervisors during 2001 and 2002 and was given a variety of work assignments.

Plaintiff worked on: (1) a vacancy announcement for a physical science position located in the

FBI's latent fingerprint section, a project that lasted for three (3) to four (4) months, Def.'s Ex.

61 (12/17/02 Moore Dep.) at 60:13-60:22 (2); the update of an "R chart," a one (1) day

assignment that Plaintiff may have been given on a "couple of occasions," *id.* at 62:4-62:6; (3) an

Internet assignment related to the laboratory relocation to Quantico, *id.* at 62:18-63:18; (4) a

survey automation project, *id.* at 65:1-65:4; (5) a "time consuming" database project to track the

funding staff level and support a hiring plan in the Laboratory Division; *id.* 68:20-69:15; and (7)

a database for the FBI's Language Services Division, *id.* at 70:11-70:21.

Third, while Plaintiff unsuccessfully attempts to minimize or distort their testimony, *see*

Pl.'s Surreply at 3-4, several of Plaintiff's supervisors -- including Ms. Cantamessa and Mr.

DeVincentis -- offered uncontested testimony that it was a typical tactic of Plaintiff to refuse or

avoid the work assigned and then create a confrontation.  For example, Ms. Cantamessa noted

that Plaintiff "refused to accept any assignments.  We tried to get her new assignments for

additional postings and she said she would not accept any work from Neil [Tellier] as team

leader." *See* Def.'s Ex. 60 (01/17/02 Cantamessa Dep.) at 54:19-22.  Mr. DeVincentis went

further in his description, noting that Plaintiff often used "tactics" "to either avoid doing the work

assigned to her or create a confrontation with UC Cantamessa." Def.'s Ex. 11 (DeVincentis

Stmt.) at 4.  According to Mr. DeVincentis, "[o]nce given what she requests, [Plaintiff] finds

only faults with what she has and continues to conduct herself in an unprofessional and

confrontational manner," *id.* at 6, and once Plaintiff completed her initial assignments she "never

sought additional work or attempted to become involved in any way in the priority work of the

IEMU," *id.* at 6-7.  As such, to the extent that Plaintiff was given less work than she desired, it

was often due to her own efforts at avoiding particular assignments and skirting responsibility.

Based upon her own testimony and the unrefuted testimony of others, Plaintiff's

contention that she received no work assignments can therefore not stand.  Because Plaintiff has

not shown that her responsibilities during 2001-2002 were reduced compared to her earlier

responsibilities, or that they were accompanied by any changes in the terms conditions, or

privileges of her employment and therefore cannot be an adverse employment action.  *See*

*Mungin*, 116 F.3d at 1557.  Plaintiff may have been dissatisfied with these assignments, but mere

dissatisfaction unaccompanied by the other factors does not rise to the level of an adverse action.

*See Forrkio*, 306 F.3d at 1130-31.

8.    Denial of TDY assignments

Plaintiff claims that Defendant "thwarted" her efforts to obtain temporary work

assignments and "prevented her from completing meaningful temporary duty assignments."

Supp. to Compl. ¶ 2.  The first alleged instance of this was the 60-day TDY to the LTAU.  *Id.* ¶

3.  The second was a summer 2002 TDY to the FBI's Office of the Ombudsman.  *Id.* ¶ 4.

In the fall of 2001, after having successfully completed a database project for the LTAU, Plaintiff was offered the opportunity for a TDY with the LTAU.  Plaintiff claims that Ms. Cantamessa and Mr. Hildebrand "failed and refused to formalize the approval of the temporary duty request, causing [her] to lose out on the temporary assignment and be relegated to . . . the Laboratory Division."  *Id.* ¶ 3.  Plaintiff's only evidence for her claim that Defendant denied her TDY request is an email in which she writes "Acting SC Mike Frady and UC Pamela Sauer advised me today that the TDY to your office is off." Pl.'s Ex. 22 (Email from Moore to Zeigler.) at 9; *see* Pl.'s Opp'n at 16.  Plaintiff has not offered any evidence that Mr. Frady or Ms. Sauer actually denied the transfer.  The Court has difficulty reconciling Plaintiff's contention that "the Office of the Ombudsman had a continuing need for the work to be conducted by Plaintiff, and continued to seek Plaintiff's services" with her conclusion that the agency denied her TDY attempt.  Pl.'s Opp'n at 16.  The record indicates that Plaintiff's services were needed and were sought by the LTAU.  *See* Def.'s Ex. 48 (Mem. from Cantamessa to Moore); *see also* Pl.'s Ex. 22 (a series of emails regarding the TDY).

The record belies Plaintiff's allegation that Defendant "failed and refused to formalize the approval" of the TDY.  Suppl. to  Compl. ¶ 3.  Ms. Cantamessa claims to have been supportive of the assignment.  Def.'s Ex. 5 (01/17/02 Cantamessa Dep.) at 196:8-196:14.  It appears that the only reason the TDY to LTAU did not occur was that Plaintiff requested the preparation of an MOU formalizing the arrangement, even though given the 60-day duration of the TDY, it appears that an MOU was not required.  Def.'s Stmt. ¶ 39.  In response to Plaintiff's request for an MOU, Ms. Cantamessa advised Plaintiff to work with Language Services to define her responsibilities in the TDY.  Plaintiff chose not to work with LTAU any further on the

49

documentation, and instead simply advised the unit that, "I can no longer perform volunteer work (TDY) on the Language Testing Program database project.  The Laboratory Division did not formalize the TDY assignment."  Def.'s Stmt. ¶ 41 (citing Def.'s Ex. 46 (12/18/01 Email from Moore to Maria Brau, et. al.)).  Even if it were true that Laboratory Division management thwarted plaintiff's participation in this TDY, such action would not be an adverse employment action absent "materially adverse consequences," which Plaintiff has not demonstrated.  *Brown*, 199 F.3d at 457.

Similarly, the aborted TDY to the FBI's Office of the Ombudsman was not an adverse employment action.  Plaintiff's contention that her supervisors "failed and refused to approve the long term temporary assignment to the Office of the Ombudsman" and that this failure was discriminatory, *see* Supp. to Compl. ¶ 6, is unsupported by the record.  Plaintiff had not presented the necessary documentation to finalize the TDY to her supervisors when she received notice of her transfer to Quantico, Virginia.  Def.'s Stmt. ¶ 46.  Nothing in the record shows that Plaintiff was denied the TDY or that she suffered materially adverse consequences when she was notified of the transfer to Quantico before she had finalized the TDY with her supervisors.

### 9.    Change of duty station to Quantico & office assignments

On September 5, 2002, Plaintiff was informed that her duty station was being transferred to the new FBI facility at Quantico, Virginia.  Def.'s Stmt. ¶ 48.  In addition to objecting to the transfer itself, there are two (2) features of the move to Quantico that Plaintiff finds to be discriminatory: (1) her increased commute time to the new facilities, and (2) the nature of her work there.  Supp. to Compl. ¶ 6.  None of these rises to the level that would establish the transfer to Quantico to be an adverse employment action.

Importantly, numerous circuits have long held that increased driving distance to work does not constitute an adverse employment action. *See, e.g.*, *Stutler v. Ill. Dep't of Corrs.*, 263 F.3d 698, 703 (7th Cir. 2001) (increased travel distance to work does not, by itself, qualify as adverse employment action); *Sanchez v. Denver Pub. Schs.*, 164 F.3d 527, 532 (10th Cir. 1998) (no adverse employment action when increased commute time was not accompanied by a change in salary or benefits). The increased commute time was certainly an inconvenience for Plaintiff, but "[m]ere inconveniences and alteration of job responsibilities will not rise to the level of adverse action," when there is no change to Plaintiff's position, grade, pay, or benefits. *Stewart*, 275 F.3d at 1135 (quoting *Childers v. Slater*, 44 F. Supp. 2d 8, 19 (D.D.C. 1999)).

The transfer to Quantico could not have been a surprise to Plaintiff, nor was it something that she alone had to endure. At the time Plaintiff received her change of duty station notice six (6) other members of the Administrative Unit also received orders and by that time the unit had already transferred three (3) of its employees to Quantico. Def.'s Stmt. ¶ 52. Employees of the Laboratory Division had known about the move to Quantico for five (5) years and Plaintiff's managers claim to have been working with employees to prepare them for the transfer to Quantico during that time. *See* Pl.'s Ex. 15 (10/09/02 Hildebrand Dep.) at 80:8-80:15. There was ample opportunity for Plaintiff and her colleagues to address the inconveniences associated with the transfer. Moreover, Plaintiff has presented no evidence in the record that she actually complained of the distance to those in charge at Quantico or asked for an accommodation. In an apparent effort to mitigate those inconveniences, Plaintiff expressed interest in a transfer to the Office of the Ombudsman, but she never finalized it. *See supra* § B.9. Given these circumstances the Court finds it impossible to conclude that the transfer to Quantico or the

51

increased driving time that accompanied it was an adverse employment action.

Plaintiff also takes issue with the work she was assigned upon reaching Quantico, which she described as "menial." Pl.'s Opp'n at 18. Plaintiff's unhappiness with this assignment notwithstanding, the record shows that there was a need for assistance with managing the massive amount of paperwork created by the construction project and the transfer of the FBI's Laboratory Division to Quantico. Def.'s Ex. 51 (Sauer Decl.) ¶ 8. Prior to Plaintiff's arrival at Quantico, this work was being handled by a single employee, with occasional assistance from one other. *Id.* It is true that the construction related work was not normally done by Management Analysts, but Plaintiff's supervisor, Ms. Sauer, felt that the transfer to Quantico gave Plaintiff

> the opportunity to provide organizational expertise commensurate with that of a GS-13 to the work that was being performed at [Quantico]; senior-level assistance was needed inasmuch as the documentation in question related to a construction site in excess of $100 million.

*Id.* ¶ 10. Plaintiff has not shown that being assigned to this job, which was apparently vital to her unit's move to Quantico, had the "materially adverse consequences," to her employment that Plaintiff needs to demonstrate in order to show an adverse employment action. *Brown*, 199 F.3d at 457. There was no change to her salary and although her responsibilities were different, her temporary assistance with construction-related tasks was, according to Plaintiff's supervisor, commensurate with someone in her position.

Plaintiff also takes issue with her temporary office assignment in the trailer at Quantico. Pl.'s Opp'n at 3, 18. But this temporary change of office spaces does not rise to the level of an adverse action. *See, e.g.*, *Halloway v. Milwaukee County*, 180 F.3d 820, 826 (7th Cir. 1999) (finding no adverse employment action where plaintiff temporarily had inadequate offices,

support staff, and materials); *Weber v. Hurtgen*, 297 F. Supp. 2d 58, 68 (D.D.C. 2003) (change in office space to an office with one (1) less window is not adverse employment action). The record shows that the trailer to which Plaintiff was temporarily assigned was well-equipped. It had air conditioning, heat, a private restroom, a refrigerator, a microwave, phone and facsimile service, a copier, numerous cabinets, and a computer. Def.'s Stmt. ¶ 54. Plaintiff was in the trailer for roughly four (4) months, and Plaintiff has adduced no independent or expert evidence in the record to suggest that the trailer itself had environmental problems.

It would defy logic to attribute Plaintiff's transfer to Quantico, her temporary workspace, or her duties there, to her race, sex or disability. Plaintiff was assigned, as had been planned for many years, to do work at her office's new headquarters and, once there, was accommodated with a well-equipped temporary work space. If such action were held to be an adverse employment action, then the entire FBI transfer to Quantico would have been brought to a halt by a wave of lawsuits from affected employees.

When examined individually, none of the above claims rises to the level of an adverse employment action. Looking at the record as a whole, as the Plaintiff urges the Court to do, does not change that conclusion. The Court finds Plaintiff's briefings to be little more than a compilation of grievances and list of possible workplace slights compiled by a dissatisfied employee. All of Plaintiff's claims outlined above are unsupported by the record, and in many cases expressly contradicted by it. While Plaintiff's relationship with her superiors could best be described as discordant and clearly unproductive to the FBI's mission, in none of the allegations listed above has the Plaintiff detailed an adverse employment action taken by Defendant. With one exception that will be discussed below, Plaintiff has not made the *prima facie* case of

discrimination necessary to sustain her Title VII discrimination claims, retaliation claims, or Rehabilitation Act claims.

      B.     *Claims Demonstrating Adverse Employment Action*

      While Plaintiff has failed to show an adverse employment action for most of her claims, she does meet the "adverse employment action" criteria for her discrimination claim related to the disciplinary action taken by the OPR against Plaintiff.  Under the *McDonnell Douglas* paradigm, Plaintiff has the initial burden of proving by a preponderance of the evidence a "*prima facie*" case of discrimination.  411 U.S. at 802, 93 S. Ct. 1817.  If she succeeds, the burden shifts to Defendant to articulate some legitimate, non-discriminatory reason for his action, and to produce credible evidence supporting his claim.  *Id.*  Defendant's burden is only one of production, and it "need not persuade the court that it was actually motivated by the proffered reasons."  *Burdine*, 450 U.S. at 254, 101 S. Ct. 1089.

      It is not disputed that the OPR's disciplinary action against Plaintiff constitutes a *prima facie* case of discrimination.[13]  The burden therefore shifts to Defendant to proffer a legitimate, non-discriminatory reason for the disciplinary action taken against Plaintiff for the confrontation on February 28, 2000.  The Court finds that Defendant has met this burden and has articulated a non-discriminatory justification for the disciplinary action.  *See* Mot. for Summary J. at 36-39. Defendant's justification is found in the OPR's May 30, 2001 letter to Plaintiff informing her of its findings and her punishment:

---

[13] Defendant does not contest that the disciplinary action constituted a *prima facie* case of discrimination and instead only addresses whether there were legitimate nondiscriminatory reasons for the discipline.  Def.'s Mot. for Summary J. at 36-39.  Defendant therefore concedes that the OPR discipline taken against Plaintiff constitutes a *prima facie* case of discrimination.

> Based on my review of the results of the inquiry, I find that when your UC
> instructed you to complete a Posting Request Form on behalf of a UC, and you
> refused to do so, you acted in disrespectful and confrontational manner, however,
> your actions fell short of insubordination.  I find you also displayed unprofessional
> conduct when you disrupted the workplace with your verbal and physical
> response.  I am therefore suspending you from duty for three calender days,
> without pay, and placing you on probation for one year.

Def.'s Ex. 27 (OPR Materials) at 1.  That letter identifies the evidence on which the OPR relied

in making its factual findings and explains why the investigator accorded more weight to the

sworn statements of witnesses than to the unsigned statement submitted by Plaintiff.  *Id* at 1-5.[14]

The OPR investigator also noted that the September 1999 confrontation between Plaintiff and

Ms. Cantamessa regarding the Kosova deployment was an aggravating factor in its decision.

Def.'s Stmt. ¶ 21; Ex. 27 (OPR Materials, Addendum) at 19.

Because Defendant has identified a legitimate, non-discriminatory reason for the

disciplinary action taken against Plaintiff, namely Plaintiff's inappropriate workplace behavior,

Plaintiff must adduce evidence sufficient to convince a trier of fact that Defendant's reason was

merely a pretext for illegal discrimination.  *Burdine*, 450 U.S. at 256,101 S. Ct. 1089; *Stella*, 284

F.3d at 144.  At this point,

> a court reviewing summary judgment looks to whether a reasonable jury could
> infer intentional discrimination or retaliation from all the evidence, including (1)
> the plaintiff's prima facie case; (2) any evidence the plaintiff presents to attack the
> employer's proffered explanation for its action; and (3) any further evidence of
> discrimination that may be available to the plaintiff (such as independent evidence

---

[14] The OPR investigator wrote: "On April 12, 2000 you were interviewed for this inquiry.
When the Supervisory Special Agent (SSA) subsequently met with you on April 18, 2000, for
your review of and signature on the statement, you refused to sign it.  Even though the SSA made
the changes you requested, you still refused to sign the statement claiming that even with your
corrections, you did not like its 'composition.'. . . I note that you submitted your own self-
prepared statement.  This statement failed to address specifics about the allegations and was not
signed."  Def.'s Ex. 27 (OPR Materials) 2-3.

of discriminatory statements or attitudes on the part of the employer).

*Carter*, 387 F.3d at 878 (internal citations and quotation marks omitted).

Although Plaintiff has alleged behavior by Defendant that could theoretically be a pretext for discrimination, she has not supported those allegations with evidence from the record. Plaintiff offers three (3) central arguments in support of her pretext claim.

       1.    <u>Denial of Due Process</u>

First, Plaintiff argues that she was denied due process because "[t]he OPR inquiry was conducted without adequate notice to [P]laintiff and without providing [P]laintiff an opportunity for a fair hearing on the charges against her." Compl. ¶ 9. Plaintiff has not cited to anything in the record showing that her case was treated any differently than any other OPR case, that the OPR process was inadequate when compared to other investigations, or that Plaintiff was not given the opportunity for a fair hearing. Importantly, Plaintiff was provided with a timely notice, on March 23, 2000, that the OPR had begun an inquiry into Plaintiff's alleged conduct. Plaintiff was then provided an opportunity to take part in the investigation led by Messrs. Laughlin and Warner, to have an EEO counselor, and to support her case with documentation and other witnesses. Plaintiff was interviewed on April 12, 2000, by Mr. Warner, who provided her with numerous opportunities and extra time to assist him in crafting an acceptable statement based on the interview to represent her version of events. Rather than assist Mr. Warner's efforts and craft a new statement that dealt solely with the issue at hand, Plaintiff frustrated the process, as she refused to sign the document and claimed that she did not like the new document's "composition" while refusing to suggest any additional changes. Finally, despite Plaintiff's lack of cooperation, the OPR ultimately agreed with Plaintiff that she was not insubordinate in

56

refusing to complete the vacancy posting without a completed Vacancy Posting Request Form

and decided to accept her representation that she did not intend to threaten Ms. Cantamessa

during the February 28, 2000 incident.  *See* Def.'s Ex. 27 (OPR Materials) at 27.  As such, there

is nothing in the record to indicate that Plaintiff was somehow afforded insufficient due process

during the OPR investigation and adjudication review.  Simply, Plaintiff has presented no

evidence to contradict the fact that the OPR conducted a thorough evaluation and arrived at a

justifiable decision.

2. <u>Improper Reliance by the OPR on False Statements</u>

Second, Plaintiff contends that the OPR improperly relied upon allegedly false statements

given by Ms. Cantamessa.  Compl. ¶ 10.  Again, Plaintiff has not presented evidence to support

her contention that Ms. Cantamessa lied during the disciplinary proceedings.[15]  Plaintiff claims

that Ms. Cantamessa presented contradictory versions of the incident serving as the basis for the

disciplinary action when, in one version, Ms. Cantamessa stated that Plaintiff returned to her

chair when requested, and in another, Plaintiff failed to do so when requested.  Pl.'s Opp'n at 22.

Plaintiff also alleges that in her first statement, Ms. Cantamessa stated that Plaintiff responded in

a "loud voice" but in the second version, Ms. Cantamessa stated that plaintiff "screamed, in a

---

[15] Plaintiff's Opposition quotes Ms. Cantamessa's sworn statement given to investigators and simply alleges that Ms. Cantamessa's statements were "false" without providing any evidence for that conclusion.  *See* Pl.'s Opp'n at 23 (citing Def.'s Ex. 15a (Cantamessa Stmt.)). The Court notes that Ms. Cantamessa's statements were sworn and signed, while Plaintiff submitted only unsigned statements to the investigator.  *Compare* Def.'s Ex. 15a (Cantamessa Stmt.) *with* Def.'s Ex. 25 (Unsigned Moore Stmt.).  The Court also finds it difficult to imagine how Plaintiff could prove her allegation that Ms. Cantamessa was lying when she wrote in her sworn statement that she was "frightened" by Plaintiff.  Pl.'s Opp'n at 23; Def.'s Ex. 15a (Cantamessa Stmt.).  An allegation that Ms. Cantamessa's sworn statements about her own state of mind are, in fact, "false," *see, e.g.* Pl.'s Opp'n at 23, cannot be considered by the Court.

pitch and tone which thoroughly disrupted the entire Unit." Opp'n at 22. The Court does not

find it unusual that someone in Ms. Cantamessa's position would provide a revised version of

her statement to an OPR investigator. It makes sense, in fact, that a supervisor would want to

review and revise the statements that she provides to investigators. Also, because the two (2)

statements are not factually different, the Court rejects Plaintiff's claim that the stylistic

differences between Ms. Cantamessa's two (2) statements, or the OPR's reliance on the second

statement demonstrate a pretext for discrimination.[16] Moreover, contrary to Plaintiff's contention

that Ms. Cantamessa somehow provided false information to the OPR, two witnesses

interviewed during the investigation -- Ms. Freda Hyatt and Ms. Cynthia Merrill -- directly

supported Ms. Cantamessa's version of events, while Ms. Heller's statement indirectly supported

Ms. Cantamessa's recollection as well; in contrast, no witness supported the version of events

now propounded by Plaintiff. Finally, even if all of these statements supporting Ms.

Cantamessa's version of the events were somehow "false," there is no evidence in the record to

suggest that the OPR's adjudication unit knew that those statements were incorrect and decided

to rely upon them anyway. *See Hastie v. Henderson*, 121 F. Supp. 2d 72, 77 (D.D.C. 2000). As

such, Plaintiff's unsupported claim that the OPR improperly relied upon false statements is

without merit, and Plaintiff's attempt to prove pretext through this avenue is unavailing..

---

[16] Plaintiff supports her claim that the OPR record was tarnished by the use of Ms.
Cantamessa's second statement by referring to the report of EEO counselor Jerome Simpson.
Pl.'s Opp'n, Ex. 11 (Simpson Affidavit and Report) at FBI-1001. Mr. Simpson's report only
summarizes Plaintiff's complaint and is based entirely upon documents Plaintiff provided to him.
*Id.* at FBI-1002. As Mr. Simpson wrote, his report "attempt[ed] to capture the tone of Ms.
Moore's allegations of discrimination." *Id.* at FBI-1004. As such, his report is not evidence that
supports Plaintiff's claims; rather, it is merely a restatement of her allegations and constitutes
second-hand hearsay.

3.      Disproportionality and Disparity in OPR Punishments

Third, and finally, Plaintiff contends that her disciplinary punishment for her infraction --

a suspension of three (3) calendar days without pay and one (1) year of probation -- was

disproportionate and based on unlawful motives due to the fact that it is a "pattern and practice"

within the FBI's OPR process that "white males consistently received more lenient punishment

than plaintiff." Pl.'s Opp'n at 28.  In support of her accusation, Plaintiff makes four arguments.

First, Plaintiff asserts that in the five pages of OPR case precedents involving employees

were charged with a "verbal altercation" provided by the OPR in her adjudication, twenty-eight

cases in all from March 1997 to May 2001, no employee was ever suspended and placed on

probation for a bare "verbal altercation." Pl.'s Opp'n at 27 (citing Def.'s Ex. 27 (OPR

Materials)).  Second, Plaintiff argues that her punishment constituted a "Level Three" discipline

under the FBI's new Schedule of Delegated Disciplinary Actions set forth in a July 18, 2002,

OPR policy change, which would put her offense with other precedents such as discharging a

weapon, stealing, misuse of a government credit card, and fighting. *Id.* at 27-28 (citing Pl.'s Ex.

21 (July 18, 2002 OPR Schedule of Delegated Disciplinary Actions) at 7, 11).  As such, Plaintiff

contends that her offense was disproportionate.  Third, Plaintiff was provided with a summary of

over eight hundred (800) precedents involving punishments for verbal altercations by the OPR

during the discovery process in this case.  *See* Pl.'s Ex. 20 (Case Summaries); Decl. of Sean

O'Neill (Assistant General Counsel to the FBI) at 1-3.  Plaintiff contends that this summary

shows that, even assuming Plaintiff had committed an "aggravating offense" through her

September 1999 altercation, "there are numerous cases of verbal altercations involving lenient

punishment where FBI employees engaged in 'aggravating' recidivist behavior." Pl.'s Opp'n at

59

29.  Picking and choosing between cases which involved merely white males, Pl.'s Ex. 31 (Cases

Involving White Males), Plaintiff notes that many of these cases involved "far more egregious

behavior by white males that resulted in less punishment than plaintiff received," Pl.'s Opp'n at

29.  Fourth, Plaintiff attacks the FBI's use of precedents in general, citing to a February 2004

study that called the FBI's database "deeply flawed" and "largely unhelpful because of enormous

variation in decisions over the years and infirmities in automation."  Pl.'s Opp'n at 30-31 (citing

to Pl.'s Ex. 32 (February 2004 OPR Study by Griffin B. Bell and Dr. Lee Coleel).

Major problems exist to undermine Plaintiff's basic arguments.  First, the OPR actually

provided Plaintiff three different lists of precedents during her adjudication process because she

was cited for a verbal altercation, making a threat, and several types of unprofessional conduct.

*See* Def.'s Ex. 27 (OPR Materials) at 1 ("It was alleged that you acted unprofessionally by

attempting to physically threaten [Ms. Cantamessa], that you were insubordinate by failing to

perform a work assignment as she directed, and that you disrupted the workplace with your

unprofessional conduct.").  The first list cited twenty-eight (28) cases involving "verbal

altercations," the second list cited fifty-seven (57) cases involving "unprofessional conduct," and

the third list cited six (6) cases involving "belligerent, threatening, and abusive behavior."  *Id.* at

10-26.  Contrary to Plaintiff's assertions, several of these cases involved incidents roughly

similar to the February 28, 2000 altercation and punishments approximating Plaintiff's

punishment of three (3) day suspension and one (1) year probation.  For instance:

- Case # 99-0365:  A Support Employee engaged in a verbal confrontation with a supervisor which disrupted the workplace.  The employee also failed to be entirely frank and cooperative during an administrative inquiry and registered "deceptive" on a polygraph examination.  The employee was suspended for 14 calendar days. Def.'s Ex. 27 (OPR Materials) at 12.

- <u>Case # 00-0004</u>:  A Support Employee exhibited unprofessional behavior by becoming involved in a verbal altercation with a Section Chief, and then throwing the Section Chief's fountain pen, breaking it.  The employee was censured and placed on probation for one year.  *Id.* at 13.

- <u>Case # 00-0050</u>:  An Agent became involved in a verbal altercation with the Director of a charity race.  The Agent was suspended for three calendar days.  *Id.*

- <u>Case # 00-0067</u>:  An Agent was charged with unprofessional conduct after becoming involved in a verbal altercation with his/her supervisor after being told he/she would be transferred to another squad.  The Agent became angry and launch into a loud, expletive-laden tirade and ripped his/her identification badge from around his/her neck and threw it on the floor.  An aggravating circumstance was that the Agent had been informally counseled on several occasions regarding his/her confrontational behavior.  The Agent was issued a letter of censure, placed on probation for one year, and encouraged to seek the guidance of EAP.  *Id.*

- <u>Case # 00-0525</u>:  A Support Employee was charged with engaging in a verbal altercation and disrupting the office with his/her offensive language and behavior when a supervisor requested that the employee sign in at the time he/she actually arrived in the office and not his/her scheduled hours.  The employee became irate and made insensitive and sexually offensive remarks to the supervisor.  This employee has a history of insubordination.  The employee was suspended for seven days and placed on six months probation.  *Id.* at 13-14.

- <u>Case # 00-0191</u>:  A Support Employee was charged with insubordination on three occasions.  The first two occasions centered around his/her lengthy absences from assigned duties, without prior approval, or without notifying anyone in order to have the telephones covered.  The employee was aware of the fact that this was his/her primary responsibility and acknowledged being previously warned concerning this activity.  Another incident of insubordination occurred when the employee, during a counseling session with management, got up and left the manager's office after being told to stay in the office until the session was completed.  The employee was also charged with disruption of the office for making general derogatory comments about various managers and openly commenting that they lacked supervisory skills.  The employee's defiant attitude toward management was well known through the small RA and caused a disruption to the RA.  The employee was suspended for ten calendar days and placed on probation for six months.  *Id.* at 21-22.

As such, it is clear that Plaintiff's claim that her punishment was unique among the precedents

provided is simply without merit.  Indeed, the OPR, in deciding to punish Plaintiff, considered

her behavior to be substantially similar to Case # 00-0091, the final case listed above, given

Plaintiff's actions and her previous altercation in September 1999.  *See id.* at 39-40.  Moreover,

an expanded review of all precedents provided shows that while some employees were given

slightly lower punishments than Plaintiff, others were subjected to significantly harsher

punishments; simply, on the whole, Plaintiff's punishment was in line with other similar

offenses.  *See id.* at 10-26.

Second, while Plaintiff cites to the FBI's July 18, 2002 Schedule of Delegated

Disciplinary Actions in support of her argument, her claim is undermined in two ways.  First, this

schedule was issued over one (1) year after Plaintiff's case was adjudicated and her punishment

handed out; therefore, it is inapplicable to Plaintiff's claims.  Second, the FBI's new schedule

would have permitted Plaintiff's punishment:  while the new schedule provides a Level One

punishment for most verbal altercations (oral reprimand), and a Level Two punishment for most

insubordination (letter of censure), it also provides both that"[i]f the disposition set forth in the

Schedule of Delegated Disciplinary Actions does not seem appropriate because of significant

aggravating or mitigating circumstances, those circumstances should be communicated to OPR"

and "[a]ny previously imposed discipline and/or repeated behavior within the previous three

years should be noted as an aggravating factor and considered when taking disciplinary action."

Pl.'s Ex. 21 (July 18, 2002 OPR Schedule of Delegated Disciplinary Actions) at 4-5.  As such,

the existence of a verbal altercation between Plaintiff and Ms. Cantamessa in September 1999

regarding the Kosovo EC was an aggravating factor that could have pushed Plaintiff's

punishment into the Level Three category (Three to Seven Calendar Day Suspension).  *Id.*

Accordingly, while not applicable to Plaintiff at the time of her adjudication, the Plaintiff's

punishment was well within the bounds of the FBI's Schedule of Delegated Disciplinary Actions.

Third, Plaintiff's references to the summary of over eight hundred (800) precedents involving punishments for verbal altercations by the OPR during the discovery process in this case, *see* Pl.'s Ex. 20 (Case Summaries), Decl. of Sean O'Neill (Assistant General Counsel to the FBI) at 1-3, and her picking and choosing between cases which involved merely white males, Pl.'s Ex. 31 (Cases Involving White Males), are simply unavailing.  Plaintiff has provided no expert evidence analyzing these cases, the relevant trends, or the FBI's system of punishment. Plaintiff's Opposition simply picks and chooses between the provided cases, and -- at most -- describes the circumstances and punishments in ten (10) of the summarized adjudications, or roughly 1.3% of the overall total.  *See* Pl.'s Opp'n at 28-30.  Plaintiff provides no statistical evidence whatsoever in support of her claim of disproportionate treatment.  While accurate statistical evidence of disparate treatment in the OPR punishment process could help demonstrate a pretext for discrimination, it is impossible for the Court to conclude based on the few OPR cases Plaintiff has cited that (1) Plaintiff actually suffered disproportionate punishment, and (2) that punishment, assuming it was disproportionate, was excessive because of Plaintiff's race, gender, purported disability, or previous EEO filings.  *See, e.g.*, *Valentino v. U.S. Postal Serv.*, 674 F.2d 56, 69 (D.C. Cir. 1982) (affirming that it was impossible to determine from plaintiff's statistics whether similarly situation men and women were treated disparately); *Moore v. Summers*, 113 F. Supp. 2d. 5, 21 (D.D.C. 2000) ("[I]n the absence of relevant statistics, seven individual incidents of alleged subjective decision-making were insufficient to give rise to an inference of pattern and practice discrimination.") (citing *Ste. Marie v. Eastern R.R. Ass'n*, 650 F.2d 395, 405 (2d. Cir. 1981)); *see generally Berger v. Iron Workers Reinforced Rodmen Local*

*201*, 843 F.2d 1395, 1411 (D.C. Cir. 1988), *on reh'g*, 852 F.2d 619 (1988), *cert denied*, 490 U.S.

1105, 109 S.Ct. 3155, 104 L. Ed. 2d 1018 (detailing the rigorous standards for the introduction of

statistical evidence in Title VII cases.).  Accordingly, without the proper foundation or statistical

evidence, the few cases arbitrarily chosen and described by her Opposition are simply insufficient

to support her disproportionality claim.

Fourth, Plaintiff reliance on the February 2004 study of the FBI's OPR is also unavailing

as support for her claims.  The study cited by Plaintiff ultimately noted that the precedent

database was "largely unhelpful because of enormous variation in decisions over the years and

infirmities in automation."  *See* Pl.'s Opp'n at 31.  Two problems exist with Plaintiff's reliance

on this document.  First, the document was produced nearly three (3) years after Plaintiff's

adjudication, and is not directly relevant to her assertions.  Importantly, Plaintiff contends that

she was given a disproportionate punishment due to sex, gender, and disability discrimination,

and in retaliation for her previous EEO filings and lawsuit.  The February 2004 study does not

concern itself with any of these alleged problems within the OPR, and instead finds problems

generally with the double-standard of discipline afforded to supervisors, an actual or perceived

climate of retaliation against FBI employees who report misconduct by superiors, and a chronic

and systematic lack of timeliness in the OPR process.  *See* Pl.'s Ex. 32 (February 2004 OPR

Study by Griffin B. Bell and Dr. Lee Coleel) at 1-5 ("Summary of Findings and

Recommendations"), 27-28 ("Overview" of "Findings").  Accordingly, the report in no way

supports Plaintiff's accusation that the OPR exhibited a preference for white males.  Second,

assuming that the report is accurate, and that the OPR's database of precedents was flawed due to

the variation in previous decisions and infirmities in automation, then it is clear that Plaintiff's

reliance on a few selected precedents from this database to support her argument that she received disproportionate punishment, *see* Pl.'s Opp'n at 29-30, would be as suspect as the OPR relying on other punishments listed to justify her punishment, *see* Def.'s Ex. 27 (OPR Materials) at 39-40.  As such, the 2004 report simply provides no support for Plaintiff's position that the explicit reasoning provided for her suspension and probation provided to her in the OPR's adjudication papers was in any way a pretext for wrongful discrimination or retaliation.

In sum, Plaintiff has not adduced evidence sufficient to convince a trier of fact that Defendant's stated reason for her punishment was merely a pretext covering up illegitimate motives.  Plaintiff's punishment was in line with several precedents provided by the OPR during the adjudication process, fit within the FBI's subsequent punishment schedule, has not been proven to be a statistical outlier, and was not impugned by the 2004 report criticizing aspects of the OPR.  Given these failings, summary judgment will be granted on this claim.

C.     *Plaintiff's Remaining Claims*

1.     Reasonable accommodation claim

Plaintiff also alleges that Defendant refused to provide her "a reasonable accommodation for her work-related disability."  Compl. ¶ 7.g.  In particular, Plaintiff claims that her work conditions in Room 3658 at FBI headquarters were unacceptable:  "Ambient environmental problems were documented in the Laboratory Division during the time plaintiff was at FBI Headquarters."  Pl.'s Opp'n at 4.  Once again, Plaintiff has provided no evidence to support her allegation other than her own personal, subjective opinion; she has provided no expert evidence indicating that the alleged environmental problems actually existed and that the FBI was aware of them, has offered no supporting testimony through other witnesses supporting her claim, and has

provided no independent documentation supporting her allegation of environmental issues.  As

such, the Court finds nothing in the record documenting "environmental problems" at the FBI.

While Plaintiff's opposition argues that Room 3658 had "poor ventilation and other

environmental problems" her only support for this is her own Answers and Objections to

Defendant's First Set of Interrogatories, prepared specifically for this case.  *Supra* § I.D. n.6;

Pl.'s Opp'n at 11 (citing Pl.'s Opp'n, Ex. 1 (Plaintiff's Answers and Objections to

Interrogatories)).  Such an undocumented conclusion is insufficient to survive summary

judgment.  *See Carter v. George Washington Univ.*, 180 F.Supp.2d 97, 111 (D.D.C. 2001)

("[S]elf-serving affidavits alone will not protect the non-moving party from summary

judgment.").  Because it is unsupported, the Court grants Defendant's Motion for Summary

Judgment on Plaintiff's reasonable accommodation claim.

### 2.    Claim of "pattern and practice" discrimination

Plaintiff claims that the allegations detailed in her complaint "are part of a pattern or

practice of race and sex discrimination against African Americans and female employees of the

FBI, and particularly employees of the FBI who are both African American and female."  Compl.

¶ 11.  Because Plaintiff has not pleaded discrimination claims that can survive Defendant's

Motion for Summary Judgment, the Court need not consider the pattern and practice claim.

### 3.    Hostile work environment claim

Plaintiff's last claim is that she was subjected to a hostile work environment.  Compl. ¶ 7.

The Supreme Court has held that "[w]hen the workplace is permeated with discriminatory

intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of

the victim's employment and create an abusive work environment, Title VII is violated."  *Harris*

*v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 114 S. Ct. 367, 126 L. Ed. 2d. 295 (1993) (citing

*Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 106 S. Ct. 2399, 91 L. Ed. 2d 49 (1986))

(internal quotation mark omitted).  The "standards for judging [workplace] hostility are

sufficiently demanding to ensure that Title VII does not become a general civility code."

*Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998)

(internal quotation marks and citations omitted).  Theses standards are designed to "filter out

complaints attacking the ordinary tribulations of the workplace."  *Id.*  (internal citations omitted).

To establish a claim of hostile work environment based on race, a plaintiff must

demonstrate: "'(1) that he or she suffered intentional discrimination because of race; (2) the

discrimination was pervasive and regular; (3) the discrimination detrimentally affected the

plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same race

in that position; and (5) the existence of respondeat superior liability.'" *Raymond v. U.S. Capitol

Police Bd.,* 157 F. Supp. 2d 50, 57 (D.D.C. 2001) (citing *Aman v. Cort Furniture Rental Corp.*,

85 F.3d 1074, 1081 (3d Cir. 1996)).  In determining whether a hostile work environment exists,

the Supreme Court has directed the courts to look at the totality of the circumstances, including

"'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or

humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an

employee's work performance.'"  *Faragher*, 524 U.S. at 787-88, 118 S.Ct. 2275 (quoting *Harris*,

510 U.S. at 23, 114 S. Ct. 367).  While a plaintiff is not required to plead a *prima facie* case of

hostile work environment in the complaint, the alleged facts must be able to support such a

claim.  *See Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1114 (D.C. Cir. 2000).

Following this standard, the Court finds that Plaintiff cannot establish a hostile work environment claim.  As discussed above, Plaintiff's claims of discrimination are largely without merit and Plaintiff has not documented conduct that rises to the level of hostility required by the Supreme Court to establish a hostile work environment claim.  Plaintiff's claims detail a discordant working environment, but not one that could be considered objectively hostile as is required to prevail on such a claim.  *Faragher*, 524 U.S. at 787, 118 S. Ct. 2275.  Plaintiff has not, for example, pointed to any similarly situated employees who were given preferential treatment over her.  Because she has not shown a single instance of discrimination, it would be impossible to conclude that Plaintiff's work environment was objectively hostile.

Undeterred by the lack of evidence to support her claim, Plaintiff makes her hostile work environment claim on the conclusion that "[b]ased on the evidence presented here, it is clear that [p]laintiff subjectively found herself in a hostile work environment."  Pl.'s Opp'n at 45.  That may be, but there is no evidence indicating even a single instance of discrimination in Plaintiff's pleadings.  It would therefore be impossible for a reasonable trier of fact to conclude that Plaintiff's workplace "is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of her employment and create an abusive work environment."  *Harris*, 510 U.S. at 21, 114 S. Ct. 367 (internal citations and quotation marks omitted).

Defendant's Motion for Summary Judgment on the hostile work environment claim is therefore granted.

**IV.     CONCLUSION**

After considering the parties' briefings, the submitted exhibits, and the relevant law, the

Court shall grant Defendant's Motion for Summary Judgment.  The Court shall also deny

Plaintiff's Motion to File a Second Supplement to Her Complaint, as well as Plaintiff's Motion

to Reconvene Mediation.  An Order accompanies this Memorandum Opinion.


Date:   August 25, 2005


                                        _/s/_____
                                        COLLEEN KOLLAR-KOTELLY
                                        United States District Judge